IN THE
UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| **ALMAZ NEZIROVIC,** | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 7:13-CV-00428** |
| | ) | |
| **GERALD S. HOLT, ET AL.,** | ) | |
| **Respondents.** | ) | |
| | ) | |

### RESPONSE IN OPPOSITION TO ALMAZ NEZIROVIC'S
### PETITION FOR WRIT OF HABEAS CORPUS

The United States, by and through its attorney, the United States Attorney for the

Western District of Virginia, hereby submits this Response in Opposition to Almaz Nezirovic's

Petition for Writ of Habeas Corpus.  Nezirovic challenges the legality of his detention based

upon the certification of his extradition to Bosnia and Herzegovina ("Bosnia" or "BiH") under

applicable treaties and the extradition statute, 18 U.S.C. § 3184, for him to face criminal charges

in Bosnia.  He asserts that two provisions in the relevant extradition treaty, regarding timeliness

and political offenses, bar his extradition.  In support of this Response, the United States offers

the following points and authorities, as well as additional points and authorities to be presented at

a hearing on this matter.[1]

---

[1]    The Court has scheduled a hearing on the habeas petition for February 7, 2014.
Communication from chambers regarding scheduling, and the docket entry, suggested that the
Court may anticipate an "evidentiary hearing."  We do not believe an evidentiary hearing is
necessary or appropriate on the habeas petition.  Habeas review of an extradition certification
differs markedly from habeas review in the criminal context.  In extradition proceedings, even
the evidentiary hearing before the Magistrate Judge is highly limited in scope, concerning only
the submission by the requesting foreign authority.  The factual record is completed before that

## I.     FACTUAL BACKGROUND

A.     <u>Nezirovic's Conduct</u>

According to an investigation conducted by Bosnian authorities, Nezirovic participated in the individual and group torture of unarmed civilian prisoners of Serbian nationality within the territory of Bosnia in the time period from April to July, 1992.  He did this in his capacity as a member of the Croatian Defense Council (abbreviated as the "HVO," based on its Croatian name), together with other HVO members, while he served as a guard at the Rabic internment camp in the municipality of Derventa, BiH, where Serbian civilians were detained.  Bosnia seeks his extradition based upon criminal charges stemming from this conduct.  (*See, e.g.*, Case No. 7:12-mc-00039, Dkt. # 3.)

The formal extradition request from BiH, which was received by Magistrate Judge Robert S. Ballou in the extradition hearing, includes a detailed statement by Bosnian District Prosecutor Izudin Berberovic, who is familiar with the charges and evidence against Nezirovic related to this investigation.  (Case No. 7:12-mc-00039, Dkt. ## 18-1–18-5, 20-1, 39-1; *see id.*, Dkt. # 18-4, at 6-17.)  He summarized as follows, before outlining relevant statements of specific witnesses at issue:

> According to statements of several victims, Nezirovic was beating the prisoners with his fist, he kicked them and also beat them with his rifle and wooden baton. Besides serious injuries which Nezirovic inflicted on prisoners' arms, legs, backs

---

judicial officer with the admission of only "explanatory" evidence by the fugitive.  *See infra* at 16-17 n.7.  Thereafter, the habeas court is tasked with an even more narrow review of the extradition certification.  *See infra* at 9-16; 18 U.S.C. § 3184.  Accordingly, we believe that the hearing will consist of argument on points raised by Nezirovic in his habeas petition and will not include the presentation of evidence by either Nezirovic or the United States.  *See, e.g., Peroff v. Hylton*, 563 F.2d 1099, 1101 (4th Cir. 1977) (declining to grant further hearing even in light of newly discovered evidence); *Gill v. Imundi*, 747 F. Supp. 1028, 1043 (S.D.N.Y. 1990) (summarizing that "[o]rdinarily, the competency of evidence is evaluated as of the time of its reception at hearing").

and heads, he used to specially beat them on their three fingers, usually used during the prayer in the Orthodox religion (prevailing religion in the Serb community).  Nezirovic also threatened to kill some of the prisoners, intimidated and traumatized them as well as the others who witnessed those threats.  Furthermore, Nezirovic humiliated and degraded prisoners on the occasions when he and other guards forced them to strip naked, stick their noses in other prisoners' butts and to eat grass on which he and the others had previously urinated.

(Case No. 7:12-mc-00039, Dkt. # 18-4, at 6-7; *see also id.* at 7-14 (summarizing specific witnesses' statements), 15 (noting that Nezirovic is expected to be formally indicted and prosecuted for a unitary charge of War Crimes against Civilians upon his return to Bosnia).  This conduct led to serious bodily injury inflicted by Nezirovic.  Witnesses cite "permanent bodily and mental injuries," including injury requiring a corrective spinal surgery, for instance; fractured ribs and multiple broken bones; and scars and back and head pain that continue.  (*E.g.*, *id.* at 6-8, 10-11; *see also* Case No. 7:12-mc-00039, Dkt. # 18-4, at 58-59.)

B.     Bosnian Legal Proceedings

On January 12, 1993, the Republika Srpska Public Safety Center, Agency for National Security, Doboj, Bosnia, issued a "Criminal Report" against Nezirovic and other individuals, which noted the following against Nezirovic:

The reported Almaz Nezirović, in the period from 4 to 6 months of 1992 in Derventa, as a member of the HVO or the BiH TO took part in mass unlawful arrests and detention of persons of Serb ethnicity.  He especially stood out in physical abuse and in May 1992 in the Rabić camp on several occasions he forced detainees to place three fingers on the table and then with other reported persons he would beat them with a baton on their fingers and on other parts of their bodies, and on that occasion he inflicted serious bodily injuries on Boro Marković, son of Nedo, Milorad Gunjević, Milo Kuzmanović, Luka Patković, Dr Željko Stajčić, Zdravko Vidović, Milovan Adžić and Ilija Čuk.

On 30 May 1992, together with Angijad Jusanović the reported person took part in beating Dr Željko Stajčić with a baton all over his body, on which occasion he sustained a serious bodily injury consisting of a left arm calvicular fracture.

(Case No. 7:12-mc-00039, Dkt. # 20-1, at 61.)

The Bosnian authorities explained that this 1993 Criminal Report is the critical step in the Bosnian legal process to initiate criminal charges against an accused:

> The Ministry of Interior, Public Security Center, Agency for National Security in Doboj, Republika Srpska, first initiated these proceedings against Almaz Nezirovic. The criminal report document is the initial document in any Bosnian criminal case, including Nezirovic's. Under the current Bosnian Criminal Procedure Code, which contains the same provisions as were in force at the time when Nezirovic's charged conduct occurred, an official body such as the Doboj Public Security Center must file a criminal charge to the bodies in charge of the investigation, *i.e.*, the prosecutor's office, to report a criminal offense.

(*Id.*, Dkt. # 39-1, at 4.) Prosecutor Berberovic quotes the relevant provisions of the Bosnian Criminal Procedure Code, (*id.*), and reiterates: "Both the Republika Srpska and Bosnia and Herzegovina view the 1993 criminal report as valid and binding today." (*Id.*)[2]

As further explained by the Bosnian government, the 1993 criminal charge is entirely valid notwithstanding the war in Bosnia when the document was issued. That war "does not mean that the acts of the Republika Srpska authorities from the war time are not legal and legitimate acts in Bosnia and Herzegovina." (*Id.* at 7.) Indeed, "[a]t no time during the war was Republika Srpska internationally recognized outside the Republic of Bosnia and Herzegovina borders." (*Id.*; *accord* Case No. 7:12-mc-00039, Dkt. # 29 (9/7/12 Evidentiary Hearing Transcript ("Transcript")) at 69-70.) Instead, during and after the war, "the territory of the current Republika Srpska was a constitutive part of the then Republic of Bosnia and Herzegovina and the current Bosnia and Herzegovina." (Case No. 7:12-mc-00039, Dkt. # 39-1, at 7; *accord, e.g.*, Transcript at 67-70, 78.)

---

[2]     As described further below, the legal interpretations of the requesting foreign authority as to its own law are entitled to deference. *See, e.g., infra* at 25, 27.

Under the 1995 Dayton Peace Accords, relations between and among the Republika Srpska, Bosnia, and other entities were specifically determined, including the handling of criminal prosecutions and Bosnia's handling of extradition requests.  (Case No. 7:12-mc-00039, Dkt. # 39-1, at 7-8.)  As agreed therein, the International Criminal Tribunal for the former Yugoslavia ("ICTY") reviewed all pending war crimes cases.  (*See* Transcript at 72-74.)  Pursuant to that review, the ICTY evaluated the sufficiency of the 1993 charge against Nezirovic and approved it for ongoing prosecution by the foreign government.  (Case No. 7:12-mc-00039, Dkt. # 39-1, at 9.)  Accordingly, it remains binding today.

Based on his alleged conduct, a warrant for Nezirovic's arrest was issued in Bosnia on May 28, 2003, by the Investigative Judge of the District Court in Doboj, Bosnia.  (*Id.*, Dkt. # 18-4, at 25-26; *see also id.* at 14-15.)  The 1993 Criminal Report not only "constitutes the first charging document submitted by the relevant authority," but also was the foundation for the subsequent steps taken in Nezirovic's case.  (*Id.*, Dkt. # 39-1, at 3, 5 (noting that the subsequent actions and orders issued, including specifically by the Investigative Judge in 2003, were "[b]ased on this report and the investigative actions initiated for the purpose of checking the allegations from the report"), 5-9; *see also id.*, Dkt. # 18-4, at 14-16.)

C.    Extradition Proceedings in the Western District of Virginia

On July 16, 2012, in response to a Treaty request by the Bosnian government, the United States filed a verified complaint for Nezirovic's arrest pending an extradition hearing pursuant to 18 U.S.C. § 3184 and the applicable treaty.  (Case No. 7:12-mc-00039, Dkt. # 3.)  Bosnia seeks Nezirovic's extradition to stand trial for War Crimes against Civilians, in violation of Article 142, paragraph 1 of the Criminal Code of the former Socialist Federal Republic of Yugoslavia (the "SFRY"), for "torture" in the form of "beating, humiliating, and traumatizing unarmed

civilian prisoners [of Serbian nationality,] causing severe personal injury" when Nezirovic was a prison guard at the Rabic camp in Derventa, Bosnia, in 1992.  (Case No. 7:12-mc-00039, Dkt. # 48, at 2; *see also id.*, Dkt. # 18-4, at 27.)  Nezirovic was arrested on the complaint at that time, and has remained detained.  (Case No. 7:12-mc-00039, Dkt. ## 4, 9.)

Bosnia seeks Nezirovic's extradition pursuant to the treaty between the United States and the Kingdom of Serbia for the Mutual Extradition of Fugitives from Justice, signed at Belgrade October 25, 1901 and entered into force June 12, 1902, U.S.-Yugo., 32 Stat. 1890 (the "Extradition Treaty" or "Treaty"), and the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, done at New York December 10, 1984 and entered into force June 26, 1987 (for the United States, November 20, 1994), S. Treaty Doc. No. 100-200, 1465 U.N.T.S. 85 (the "CAT").

In support of extradition, the United States submitted the formal extradition request from the Bosnian government, which included supplemental information provided by Bosnia to respond to questions Nezirovic raised before Judge Ballou.  (*See* Case No. 7:12-mc-00039, Dkt. ## 8, 18, 20, 39.)  In those materials, the Bosnian authorities graphically describe the serious allegations of Nezirovic's alleged war crimes, as noted specifically above.  Particular information in the formal extradition request details how Nezirovic's conduct caused great physical and emotional suffering and serious injury to individuals detained at the Rabic camp. (*See, e.g.*, Case No. 7:12-mc-00039, Dkt. # 18-4, at 6-14, 58-59.)

Nezirovic argued before Judge Ballou, as he does again here, that the Treaty itself prevents his extradition.  He claims first that his extradition is barred by the Treaty's timeliness provision.  Treaty, Art. VII.  He also claims that his alleged conduct constitutes a "political offense" for which he cannot be extradited.  Treaty, Art. VI.

6

The parties fully briefed the issues before Judge Ballou, and Judge Ballou held several hearings, which included the extradition hearing itself, where evidence was presented, and then a separate argument hearing on the extradition.  (Case No. 7:12-mc-00039, Dkt. ## 18, 19, 20, 21, 23, 24, 29, 37, 38, 40, 43.)

On September 16, 2013, Judge Ballou issued his 35-page Memorandum Opinion and Order, reviewing all of the parties' arguments and certifying that Nezirovic is subject to extradition under 18 U.S.C. § 3184.  (Case No. 7:12-mc-00039, Dkt. # 48 ("Certification").) Judge Ballou reviewed the case history in detail and outlined his key findings, including finding that each element for certification under Section 3184 had been met.  (*Id.* at 1-13.)  These findings included specifically that:  "1) the judicial officer has jurisdiction to conduct an extradition proceeding; 2) the court has jurisdiction over the fugitive; 3) the person before the court is the fugitive named in the request for extradition; 4) there is an extradition treaty in full force and effect; 5) the crimes for which surrender is requested are covered by that treaty; and 6) there is competent legal evidence to support the finding of probable cause as to each charge for which extradition is sought."  (*Id.* at 3); *see Fernandez v. Phillips*, 268 U.S. 311, 312 (1925); *Eain v. Wilkes*, 641 F.2d 504, 508 (7th Cir. 1981); *e.g.*, *In the Matter of the Extradition of Atuar*, 300 F. Supp. 2d 418, 425-27 (S.D. W. Va. 2003).  Judge Ballou also carefully appraised Nezirovic's arguments pertaining to timeliness, (*id.* at 13-28), and to the applicability of the political offense exception, (*id.* at 28-34).

Judge Ballou rejected both of Nezirovic's specific objections to his extradition.  First, Judge Ballou found that the extradition of Nezirovic will not violate any applicable statute of limitations.  Judge Ballou ruled that the U.S. Torture Act, 18 U.S.C. § 2340A, provides the applicable statute of limitations for analyzing Article VII of the Treaty, because the Torture Act

was "the most analogous statute under United States law" based on the allegations against Nezirovic. (Case No. 7:12-mc-00039, Dkt. # 48, at 15.) As he summarized: "Bosnia charges that Nezirovic engaged in acts which constitute torture against civilians and prisoners while he served as a guard at the Rabic camp. The evidence submitted with the extradition request asserts that Nezirovic's actions resulted in, or created a foreseeable risk of, death or serious bodily injury to another person, and thus, under [18 U.S.C.] § 3286(b) there is no limitation period applicable to the Extradition Treaty." (*Id.*)

As Judge Ballou outlined, "the court determines the applicable limitation period based upon the laws in effect at the time of the extradition request and not when the acts allegedly occurred." (*Id.* at 15; *see also id.* at 15-19.) In that analysis, the Torture Act is clearly the most appropriate statute to apply. Further, the Treaty does not require any determination of whether Nezirovic would be subject to prosecution in the United States today. (*Id.* at 19.) Stated simply, Nezirovic is not charged with War Crimes against Civilians in the United States, and Nezirovic's attempt to import such a requirement—which he had the burden to prove—goes against the language of the Treaty. (*Id.* at 19-22.) "A highly technical analysis of a hypothetical domestic prosecution . . . is not the proper means to determine if Article VII of the Extradition Treaty disallows extradition on a statute of limitations ground." (*Id.* at 22; *see also* Case No. 7:12-mc-00039, Dkt. # 18, at 32 n.9.) Finally, Judge Ballou found that any relevant statute of limitations would be tolled based upon the 1993 Criminal Report—as to which the evidence was uncontradicted that it would toll the statute of limitations under Bosnian law. (Certification at 23-28.)

Judge Ballou also rejected Nezirovic's claim that his actions constituted a "political offense" and cannot serve as a basis for extradition under the Treaty on that basis. As Judge

Ballou found, even when an offense occurs within the context of a political disturbance, "[t]he court must next determine whether the acts charged . . . were recognizably incidental to the political disturbance." (*Id.* at 29.)  In that inquiry, "Nezirovic must show not only that the alleged offenses were subjectively politically motivated, but also that they were objectively political." (*Id.* at 29-30.)  Judge Ballou found that Nezirovic could not meet his burden under either prong of this test.  (*See id.* at 30-32.)  The Court specifically noted that "Nezirovic's suggestion that the torture of civilians is somehow justified by the general cruelty of ongoing war is contrary to basic provisions of international law, which prohibit such crimes against humanity." (*Id.* at 33.)

Nezirovic has now filed a petition for writ of habeas corpus and supporting brief in this Court, claiming that the Certification was issued in error based on the Treaty's timeliness and political offense exception provisions.  (Case No. 7:13-cv-00428, Dkt. ## 1, 20.)  Because each and every requirement for extradition under the Treaty has been met, Nezirovic's petition should be denied.  This Court's review is highly limited, and Nezirovic raises no legitimate challenge to Judge Ballou's well-reasoned Certification.  The Secretary of State should be allowed to proceed to his ultimate decision as to Nezirovic's extradition and surrender.

## II.    HABEAS REVIEW OF AN EXTRADITION CERTIFICATION IS LIMITED

After issuance of a certification, a person subject to extradition can challenge the legality of his further confinement, pending the Secretary of State's decision on extradition and surrender, only by petitioning the district court for a writ of habeas corpus.  *Shapiro v. Ferrandina*, 478 F.2d 894, 901 (2d Cir. 1973).  The scope of the district court's review in these cases is exceedingly narrow.  "[H]abeas corpus is available *only* to inquire whether the magistrate [judge] had jurisdiction, whether the offense charged is within the treaty and, by a

somewhat liberal extension, whether there was *any evidence* warranting the finding that there was reasonable ground to believe the accused guilty." *Fernandez v. Phillips*, 268 U.S. at 312 (emphases added); *Haxhiaj v. Hackman*, 528 F.3d 282, 286-87 (4th Cir. 2008). Habeas corpus is not a writ of error, nor "a means for rehearing what the magistrate already has decided." *Fernandez*, 268 U.S. at 312; *see also Skaftouros v. United States*, 667 F.3d 144, 158 (2d Cir. 2011) ("'The alleged fugitive from justice has had his hearing.'"); *Gill*, 747 F. Supp. at 1043 ("[T]he *habeas* court does not sit to superimpose its view of the record on that of the extradition magistrate.").[3]

Thus, a habeas action for the review of an extradition decision does not afford the reviewing court an opportunity to weigh the evidence or serve in a fact-finding capacity. "Just as the magistrate judge's underlying determination is not a mini-trial on the guilt or innocence of the fugitive, the district court's habeas review should not duplicate the extradition hearing." *Ordinola v. Hackman*, 478 F.3d 588, 610 (4th Cir. 2007) (Traxler, J., concurring); *see also, e.g.*, *Garcia-Guillern v. United States*, 450 F.2d 1189, 1192-93 & n.1 (5th Cir. 1971) (noting that "[a] writ of habeas corpus cannot be used to hear for a second time the findings of the court which conducted the initial hearing," and mentioning with approval the district court's refusal to analyze a statute of limitations argument raised there, based upon these principles); *Wroclawski v. Clinton*, 486 F. App'x 684 (9th Cir. 2012) (continuing to rely, on appeal of the denial of habeas, simply on "the findings of fact by the magistrate judge").

---

[3]   Nezirovic misstates the legal standard in this case, instead citing the legal standard for the magistrate judge's review (rather than habeas review) in his brief. Nezirovic Habeas Br. at 7. The case Nezirovic cites states the correct, more limited, standard a few sentences later. *Mironescu v. Costner*, 480 F.3d 664, 665-66 (4th Cir. 2007).

Instead, the district court must pay "substantial deference to the magistrate judge's factual findings." *Ordinola*, 478 F.3d at 599; *see also id.* at 598 (quoting *Ornelas v. Ruiz*, 161 U.S. 502, 509 (1896)). In reviewing the extradition court's decision to issue an extradition certification, the standard of review "is *at least* as deferential, if not more so, than that applied to a magistrate judge's decision to issue a search warrant." *Ordinola*, 478 F.3d at 609-10 (Traxler, J., concurring) (emphasis in original). Ultimately, the findings of fact of the extradition magistrate are reviewed for clear error. *Quinn v. Robinson*, 783 F.2d 776, 791 (9th Cir. 1986). Findings of law and mixed questions of law and fact are subject to *de novo* review, with the appropriate deference to the magistrate's findings of fact. *Id.*; *see also Ornelas*, 161 U.S. at 509.

The evidentiary standard for extradition under the Treaty applicable here requires "such evidence of criminality as, according to the laws of the place where the fugitive or person so charged shall be found, would justify his or her apprehension and commitment for trial if the crime or offense had been committed there." Treaty, Art. I. Courts have interpreted this type of treaty language simply to "'requir[e] a showing by the requesting party that there is probable cause to believe that the accused has committed the charged offense.'" *United States v. Lui Kin-Hong*, 110 F.3d 103, 117 (1st Cir. 1997).[4]

---

[4]    Nezirovic is incorrect that the language in Article I of the Treaty regarding "evidence of criminality" constitutes a "dual criminality requirement of the Treaty." *See* Nezirovic Habeas Br. at 11-13; (Case No. 7:12-mc-00039, Dkt. # 19 (Nezirovic Mot. to Dismiss), at 13). The Treaty is an older list treaty; there is no dual criminality requirement as to substantive offenses. Instead, as Judge Ballou found, Article I's language simply establishes the Treaty's "probable cause" requirement. *Kin-Hong*, 110 F.3d at 117; *accord Factor v. Laubenheimer*, 290 U.S. 276, 290 (1933); *Eain*, 641 F.2d at 507-08; *In the Matter of the Extradition of Bertrand*, No. 85-0158J-01, 1986 WL 8845, at *4 (D.N.J. June 13, 1986); (Case No. 7:12-mc-00039, Dkt. # 18, at 5; *id.*, Dkt. # 23, at 7; Certification at 12, 19-20).

This probable cause standard "is the same as the standard used in federal preliminary hearings." *Hoxha v. Levi*, 465 F.3d 554, 561 (3d Cir. 2006); *In the Matter of the Extradition of Garcia*, 825 F. Supp. 2d 810, 828-29 (S.D. Tex. 2011). Judge Ballou made this probable cause finding, and it is not challenged here. (Certification at 12-13; Nezirovic Br.)[5]

Even where habeas petitioners do challenge the magistrate judge's finding of probable cause, the function of the habeas court in extradition matters is simply to determine "whether there is *any competent evidence* tending to show probable cause." *Balzan v. United States*, 702 F.3d 220, 223 & n.8 (5th Cir. Dec. 7, 2012) (citing *Escobedo v. United States*, 623 F.2d 1098, 1101 (5th Cir. 1980)) (emphasis added). "The weight and sufficiency of that evidence" is beyond the scope of the habeas court's review. *See, e.g.*, *id.*; *Gusikoff v. United States*, 620 F.2d 459, 462 (5th Cir. 1980). The reviewing court does not go beyond its limited inquiry and "re-evaluate" evidence that the magistrate judge has already evaluated. *See Montemayor Seguy v. United States*, 329 F. Supp. 2d 883, 886 (S.D. Tex. 004) (noting that "this is not an appeal; it is an extraordinary remedy used in special circumstances").

The petitioner in a habeas proceeding bears a heavy burden to demonstrate that his confinement is illegal. "Habeas corpus, it is well known, 'is not a neutral proceeding in which the petitioner and the State stand on an equal footing. Rather, it is an asymmetrical enterprise in which a prisoner seeks to overturn a presumptively valid judgment.'" *Skaftouros*, 667 F.3d at

---

[5]     In the hearing below, the judiciary's important but limited role is to consider whether the evidence of criminality presented by the country requesting extradition is "sufficient to sustain the charge under the provisions of the proper treaty or convention." 18 U.S.C. § 3184; *see Martin*, 993 F.2d at 828. The purpose of this "limited inquiry," *Hoxha*, 465 F.3d at 560, is "to determine whether an individual who has been arrested in the United States, pursuant to a complaint filed on behalf of a foreign government, is," in fact, "subject to surrender to" the requesting government under the terms of the applicable treaty, *Sidali*, 107 F.3d at 194-95. *See also Ordinola*, 478 F.3d at 597 (reciting these principles).

158 (citations omitted).  Thus, because courts "accord a presumption of validity to a judgment on collateral review, it is the petitioner who bears the burden of proving that he is being held contrary to law," and he must do so by a preponderance of the evidence.  *Id.*

This Court's review is further informed by the narrow focus of the initial judicial inquiry in an extradition proceeding and the distinctive character of international extradition as a function of the Executive, rather than the Judicial, branch of government.  Extradition is "the surrender by one nation to another of an individual accused or convicted of an offense outside of its own territory, and within the territorial jurisdiction of the other," in order for the requesting nation to complete its legal process against the fugitive.  *Terlinden v. Ames*, 184 U.S. 270, 289 (1902).  The power to extradite "derives from the President's power to conduct foreign affairs." *Sidali v. Immigration & Naturalization Serv.*, 107 F.3d 191, 194 (3d Cir. 1997).  Granting or denying another country's extradition request is the Executive's prerogative.  18 U.S.C. § 3186. Because "[e]xtradition is primarily a function of the executive branch, . . . the judiciary has no greater role than that mandated by the Constitution, or granted to the judiciary by Congress." *Austin v. Healey*, 5 F.3d 598, 601-02 (2d Cir. 1993); *see also Atuar*, 300 F. Supp. at 425.

"Constitutional procedural protections which by their terms are applicable only in criminal cases . . . are unavailable in extradition proceedings."  *Martin v. Warden, Atlanta Penitentiary*, 993 F.2d 824, 829 (11th Cir. 1993) (noting, at 828, that extradition "clearly is not a criminal proceeding"); *see also In the Matter of the Extradition of Mainero*, 990 F. Supp. 1208, 1218 (S.D. Cal. 1997).  As examples, the fugitive does not have the right to confront his accusers, *Bingham v. Bradley*, 241 U.S. 511, 517 (1916); *In re Rodriguez Ortiz*, 444 F. Supp. 2d 876, 885 (N.D. Ill. 2006); nor to cross examine witnesses who might testify at the extradition hearing, *Oen Yin-Choy v. Robinson*, 858 F.2d 1400, 1406-07 (9th Cir. 1988); *Messina v. United*

*States*, 728 F.2d 77, 80 (2d Cir. 1984); *Lopez-Smith v. Hood*, 951 F. Supp. 908, 913 (D. Ariz. 1996).  There is no right to a speedy trial or extradition, either through the Sixth Amendment or under the Fifth Amendment's Due Process Clause.  *Neely v. Henkel*, 180 U.S. 109, 122 (1901); *DeSilva v. DiLeonardi*, 181 F.3d 865, 867 (7th Cir. 1999); *Yapp v. Reno*, 26 F.3d 1562, 1565 (11th Cir. 1994).  And the Fifth Amendment guarantee against double jeopardy does not apply to successive extradition proceedings.  The United States can file repeated complaints regarding the same crime, and *res judicata* does not bar such efforts even if a prior court has found an absence of probable cause.  *See, e.g.*, *Collins v. Loisel*, 262 U.S. 426, 429-30 (1923); *Bovio v. United States*, 989 F.2d 255, 261 n.5 (7th Cir. 1993); *In the Matter of the Extradition of McMullen*, 989 F.2d 603, 612-13 (2d Cir. 1993) (en banc).

In the end, the fact that a fugitive "may be able to assert a strong defense and avoid being convicted in no way implies that extradition is improper."  *Prushinowski v. Samples*, 734 F.2d 1016, 1018 (4th Cir. 1984).  As the Fourth Circuit summarized:  "It is not our function to afford a trial on the merits, and . . . we defer to a tribunal far better qualified than we to assess the merits of [the fugitive]'s defenses" to the underlying charges.  *Id.*; *see also In the Matter of the Extradition of Solis*, 402 F. Supp. 2d 1128, 1131 (C.D. Cal. 2005).  This is consistent with the general, well-settled rule that issues which require factual and credibility determinations are for the court in the requesting country to resolve at trial—and not for any court of the United States to attend to in an extradition proceeding.  *See, e.g.*, *Bovio*, 989 F.2d at 259; *Eain*, 641 F.2d at 511.

In fulfilling their statutory function in extradition proceedings, courts should "liberally construe" the applicable extradition treaty in order to effect its purpose—namely the surrender of fugitives to the requesting country.  *See Valentine v. United States ex rel. Neidecker*, 299 U.S. 5,

10 (1936) ("It is a familiar rule that the obligations of treaties should be liberally construed so as to give effect to the apparent intention of the parties."); *Factor*, 290 U.S. at 303 ("Extradition treaties are to be liberally, not strictly, construed."); *Kin-Hong*, 110 F.3d at 110 (reciting these principles); *Rodriguez Ortiz*, 444 F. Supp. 2d at 883 (same). Courts have "consistently opined" that "'[a] narrow and restricted construction [of extradition treaties] is to be avoided as not consonant with the principles deemed controlling in the interpretation of international agreements,'" which include diplomatic considerations and reciprocity. *McElvy v. Civiletti*, 523 F. Supp. 42, 47 (S.D. Fla. 1981) (quoting *Factor*, 290 U.S. at 293). As "[f]oreign powers are not expected to be versed in the niceties of our criminal laws," *Factor*, 290 U.S. at 298, "[f]orm is not to be insisted upon beyond the requirements of safety and justice," *Fernandez*, 268 U.S. at 312.[6]

Judge Ballou applied these principles in the extradition proceeding that resulted in the September 16, 2013 Certification. After conducting the limited inquiry authorized under 18 U.S.C. § 3184, Judge Ballou found sufficient probable cause and "certif[ied] the [evidence], together with a copy of all the testimony taken," to the Secretary of State. 18 U.S.C. § 3184; *see, e.g.*, *Prasoprat v. Benov*, 421 F.3d 1009, 1012 (9th Cir. 2005) (noting that this certification is not discretionary, if the evidence is sufficient to sustain the charge). Habeas review is available only in the limited manner described above.

---

[6]    Courts also give great weight to statements by the Department of State regarding the interpretation of treaties. *See, e.g.*, *El Al Israel Airlines, Ltd. v. Tseng*, 525 U.S. 155, 168 (1999) ("Respect is ordinarily due the reasonable views of the Executive Branch concerning the meaning of an international treaty."); *Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176, 184-85 (1982) ("Although not conclusive, the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight."); *Kin-Hong*, 110 F.3d at 110 (applying these principles in the extradition context). These treaties are within the Department of State's area of expertise—specifically the constitutional duties of the Executive relating to foreign affairs.

After a habeas petition is resolved, the Secretary, in turn, decides whether to extradite and surrender the fugitive "according to the stipulations of the treaty or convention." 18 U.S.C. §§ 3184, 3186; *see Ordinola*, 478 F.3d at 597; *Eain*, 641 F.2d at 508. The Secretary "conducts an independent review of the case to determine whether to issue a warrant of surrender." *Martin*, 993 F.2d at 829; *Sidali*, 107 F.3d at 195 n.7. In this independent review, "[t]he Secretary exercises broad discretion and may properly consider myriad factors affecting both the individual defendant as well as foreign relations which an extradition magistrate may not." *Martin*, 993 F.2d at 829; *see also Kin-Hong*, 110 F.3d at 109-10 ("The Secretary may also decline to surrender the relator on any number of discretionary grounds, including but not limited to, humanitarian and foreign policy considerations," and may "attach conditions to the surrender of the relator"). Accordingly, *the Secretary*, rather than any judicial officer issuing an extradition certification or the reviewing judge on habeas, decides whether the fugitive should be extradited and surrendered. *See* 18 U.S.C. §§ 3184, 3186; *Lo Duca v. United States*, 93 F.3d 1100, 1103-04 (2d Cir. 1996). The decision of whether to extradite and surrender the fugitive to the requesting country rests exclusively with the Executive Branch, specifically with the Secretary of State. *See, e.g.*, *Austin*, 5 F.3d at 603; *Peroff*, 563 F.2d at 1102.[7]

---

[7]     Nezirovic commits significant portions of his brief to his own recitation of the history of the Bosnian conflict and his role in it, inappropriately terming it "essential historical background;" and citing books and evidence not in the record. He also disputes the merits of the underlying Bosnian charge in a manner that is wholly inappropriate in this forum. Nezirovic Habeas Br. at 2-6, 21-25, 27, 28, 33-34. The extradition magistrate's certification is based upon the formal extradition request and any supplements, along with any opposing evidence admitted at the hearing. The habeas review looks for error in the certification based upon the record before the Magistrate Judge. *See supra* at 1-2 n.1. Consequently, further evidentiary submissions are not anticipated in extradition habeas, as mentioned above. Even before the Magistrate Judge at the extradition hearing, moreover, although a fugitive "may be permitted to offer *explanatory* testimony," he has "no right to . . . introduce evidence to rebut that of the prosecutor" and "may not offer proof which contradicts that of the demanding country."

## III.    THE EXTRADITION IS NOT BARRED BY ANY STATUTE OF LIMITATIONS

In his habeas petition, Nezirovic makes the same statute of limitations argument which was considered and rejected by Judge Ballou.  More specifically, he asserts that his detention is illegal because Bosnia failed to satisfy the "timeliness" provision of the Treaty, Article VII. Nezirovic Habeas Br. at 7-25.  As Judge Ballou correctly concluded, however, the Bosnian prosecution of Nezirovic is entirely timely and the Treaty provision is satisfied.  (Certification at 13-28.)  Nezirovic's arguments fail because no U.S. statute of limitations applies to the war crimes charged here.  No *ex post facto* issue changes this result, because *ex post facto* protections do not apply in an international extradition proceeding.  Even if a statute of limitations did apply in this matter, the January 12, 1993 Criminal Report (also referred to as a "criminal charge") against Nezirovic renders any time-bar exception inapplicable.  As explained above, the Bosnian District Prosecutor submitted an authoritative affidavit making clear that the 1993 charge, like a U.S. criminal Information, initiates the criminal process in Bosnia and tolls the statute of limitations under Bosnian law.  Judge Ballou's factual findings in this area, as elsewhere, are

---

*Messina*, 728 F.2d at 80 (emphasis added); *see also Koskotas v. Roche*, 931 F.2d 169, 175 (1st Cir. 1991) ("[C]ontradictory evidence [to the charges] properly may be excluded."); *Mainero*, 990 F. Supp. at 1216 ("Respondent has no right to rebut prosecutorial evidence.").  "[T]he court 'must accept as true all of the statements and offers of proof by the demanding state.'" *In the Matter of the Extradition of Cheung*, 968 F. Supp. 791, 794 n.6 (D. Conn. 1997) (quoting *In the Matter of the Extradition of Marzook*, 924 F. Supp. 565, 592 (S.D.N.Y. 1996)); *see also Ahmad v Wigen*, 726 F. Supp. 389, 399-400 (E.D.N.Y. 1989) ("The primary source of evidence for the probable cause determination is the extradition request, and any evidence submitted in it is deemed truthful for purposes of this determination."), *aff'd*, 910 F.2d 1063 (2d Cir. 1990); *In the Matter of the Extradition of Atta*, 706 F. Supp. 1032, 1052 (E.D.N.Y. 1989) (noting that "challenges to evidence submitted by the United States in an extradition proceeding are not permissible" but may, instead, "be directed to the State Department"); Case No. 7:12-mc-00039, Dkt. # 18, at 10-12.  Any additional evidence Nezirovic may want to proffer at this time is appropriately directed to the Secretary to be considered in his decision-making pursuant to 18 U.S.C. § 3186.

entitled to substantial deference.  The 1993 charge is the functional equivalent of a U.S. charging

document as to the initiation of proceedings and confirms that any time-bar is foreclosed.[8]

    A.    <u>No Statute Of Limitations Applies Under The Analogous U.S. Statute</u>

    Nezirovic can claim no protection from the Treaty's provision that extradition may not be

granted when legal proceedings have "become barred by limitation" according to the laws of the

requested country—here, the United States.  Treaty, Art. VII.  The statute of limitations

exception is inapplicable because no statute of limitations applies in the United States for the

crime charged here.

    In evaluating treaty provisions such as Article VII, courts "look[] to the substantive

offense under United States law which is most closely analogous to the charged offenses, and

appl[y] the statute of limitations applicable to that offense."  *Sainez v. Venables*, 588 F.3d 713,

716 (9th Cir. 2009); *In the Matter of the Extradition of Handanovic*, 829 F. Supp. 2d 979, 991

(D. Or. 2011); *Mujagic*, Case No. 5:12-mj-00529, Dkt. # 27, at 33-36.  Nezirovic is charged with

perpetrating "torture," which includes the intentional infliction of severe physical or mental pain

or suffering upon a person.  SFRY Criminal Code, Art. 142.

    The federal "Torture" statute, 18 U.S.C. § 2340A, is the most analogous U.S. statute to

cover Nezirovic's alleged torture of Serbian civilian prisoners.  (*See* Case No. 7:12-mc-00039,

---

[8]    The criminal "report" or "charge" in the instant request is the identical document to that submitted by the Bosnian government in the request for extradition of Azra Basic, (*see* E.D.K.Y. Case No. 5:11-mj-05002, Dkt. # 1-5), and is the same type of document as that submitted in the request for extradition of Sulejman Mujagic, (N.D.N.Y. Case No. 5:12-mj-00529, Dkt. # 1-1, at 30-32).  The extradition magistrates in the three cases all deferred to the statements of foreign law in the requests and agree that the document constitutes the first step in the Bosnian prosecution to toll any applicable statute of limitations.  (*In the Matter of the Extradition of Basic*, No. 5:11-MJ-5002, 2012 WL 3067466, at *15-16 (E.D. Ky. July 27, 2012); "Decision, Order, and Certificate of Extraditability," *In the Matter of the Extradition of Mujagic*, Case No. 5:12-mj-00529 (DEP), Dkt. # 27, at 5-6, 15-16 (N.D.N.Y. April 2, 2013); Certification at 23-28.)

Dkt. # 18, at 28-29; Certification at 15.)  Further, Nezirovic's alleged conduct resulted in numerous debilitating and permanent physical and emotional injuries for his victims.  (Case No. 7:12-mc-00039, Dkt. # 18, at 26-27; *see also id.*, Dkt. # 18-4, at 6-14, 58-59.)[9]

Pursuant to 18 U.S.C. § 3286(b), no statute of limitations applies under Section 2340A where a crime "resulted in, or created a foreseeable risk of, death or serious bodily injury to another person."  *Id.*; *see also* 18 U.S.C. § 2332b(g)(5)(B)(i) (including as a "Federal crime of terrorism" violation of 18 U.S.C. § 2340A).  Accordingly, no U.S. statute of limitations bars extradition, and Nezirovic cannot meet his burden of establishing that any statute of limitations has run.  *See Skaftouros*, 667 F.3d at 161; (*see also* Case No. 7:12-mc-00039, Dkt. # 23, at 2-7 (detailing the applicability of Section 2340A); Certification at 15.)

B.  *Ex Post Facto* Principles Are Inapplicable Here

Nezirovic claims that because Section 2340A was not enacted until after his alleged war crimes, the five-year statute of limitations applicable to simple assault should be used in connection with Article VII.  18 U.S.C. §§ 113, 3282; Nezirovic Habeas Br. at 11; *see also id.* (even acknowledging that Section 113 "does not cover all of the allegations against Nezirovic").  However, the test under extradition law is not which of various statutes could have been applied to the conduct if it had been committed in the United States originally, but to use the statute of limitations applicable to the federal statute most analogous *today*.  Judge Ballou correctly concluded that the most applicable statute is Section 2340A, which has no statute of limitations.  "The law pertinent to the question of extradition is the law in force *at the time of the demand*."

---

[9]  Throughout the proceeding, Nezirovic has not contested that Section 2340A is the U.S. statute most closely analogous to his offense.  He even admitted that the Bosnian submissions establish probable cause of his commission of "torture."  (*See* Case No. 7:12-mc-00039, Dkt. # 19, at 11, 20.)

*In the Matter of the Extradition of Murphy*, No. 98-M-168, 1998 WL 1179109, at *5 n.3

(N.D.N.Y. June 30, 1998) (emphasis added), *aff'd*, 199 F.3d 599 (2d Cir. 1999); *see also Hilario*

*v. United States*, 854 F. Supp. 165, 176 (E.D.N.Y. 1994) ("[T]he law pertinent to [the propriety

of the fugitive's surrender], whether reflected in treaty or statute, is determined solely with

reference to the time surrender is demanded."); (Certification at 11, 20, 21).  Accordingly, the

fact that Section 2340A had not yet been enacted at the time of Nezirovic's original conduct is

irrelevant.[10]

In his habeas petition, Nezirovic denies that he is attempting to import *ex post facto*

protections into this proceeding.  Nezirovic Habeas Br. at 9, 10, 14.  Yet he argues that the Court

must apply a less applicable statute, on the grounds that the most applicable one was enacted

after commission of Nezirovic's offenses.  His argument is, indeed and in effect, an *ex post facto*

claim.  It is misplaced, because *ex post facto* protections have no place in the extradition context.

(*See* Case No. 7:12-mc-00039, Dkt. # 18, at 30-33; *id.*, Dkt. # 23, at 4-7; *United States ex rel.*

*Oppenheim v. Hecht*, 16 F.2d 955, 955-57 (2d Cir. 1927); *Hilario*, 854 F. Supp. at 175-76.  Such

protections "have no relation to crimes committed without the jurisdiction of the United States

against the laws of a foreign country."  *Neely*, 180 U.S. at 122; *see also Gallina v. Fraser*, 177 F.

Supp. 856, 864 (D. Conn. 1959), *aff'd*, 278 F.2d 77 (2d Cir. 1960).  Applying them also affronts

---

[10]      Nezirovic's claim that the Court would look to the substantive offense under U.S. law "at
the time the offense occurred" is wrong and goes against all of the authority cited herein.
Nezirovic Habeas Br. at 8.  Neither of the cases he cites lays out such a rule.  Instead, both cite
the general rule that one looks to apply the statute of limitations for "'the substantive offense
under United States law which *is* most closely analogous to the charged offenses'" (emphasis
added), as stated above.  *Sainez*, 588 F.3d at 716; *Handanovic*, 829 F. Supp. 2d at 991.  *See also,
e.g.*, *Gallina v. Fraser*, 177 F. Supp. 856, 864 (D. Conn. 1959) (addressing context where a
treaty had been suspended at the time of the alleged offense), *aff'd*, 278 F.2d 77 (2d Cir. 1960);
*Demjanjuk v. Petrovsky*, 776 F.2d 571, 582-83 (6th Cir. 1985) (finding that the fact that Israel
did not exist at the time when the crimes for which extradition was sought were committed did
not bar extradition to Israel), *vacated on other grounds*, 10 F.3d 338 (6th Cir. 1993).

the precept of interpreting treaties so as to give the greatest effect to their purpose of returning

fugitives to the requesting country.  *See, e.g.*, *Valentine*, 299 U.S. at 10; *Rodriguez Ortiz*, 444 F.

Supp. 2d at 883.  "[C]ourts must approach challenges to extradition with a view towards finding

the offenses within the treaty."  *McElvy*, 523 F. Supp. at 48.

As the court noted in *Oppenheim*, because a fugitive's asylum in this country can be

removed by a change in treaty provisions, it can certainly be removed by other changes in law—

*including* the passage of a statute that criminalizes the fugitive's conduct after it was committed.

16 F.3d at 955-57.  The court noted:  "[A] fortiori is [asylum] taken away when one of the high

contracting parties somewhat belatedly recognizes as criminal a well-known" criminal act.  *Id.*;

*see also In the Matter of the Extradition of Ernst*, No. 97 CRIM. MISC 1PG22, 1998 WL 51130,

at *5 (S.D.N.Y. Feb. 5, 1998) (finding that "the deprivation of a successful defense to

extradition" did not impose any punishment and therefore did not invoke *ex post facto*

protections).  "Although punishment may follow extradition, extradition itself never has been

considered punishment."  *McMullen*, 989 F.2d at 611; *see also Jhirad v. Ferrandina*, 536 F.2d

478, 482 (2d Cir. 1976) (noting that orders of extradition "embody no judgment on the guilt or

innocence of the accused but serve only to insure that his culpability will be determined in

another and, in this instance, a foreign forum").

"The Ex Post Facto Clause forbids Congress to enact any law 'which imposes a

punishment for an act which was not punishable at the time it was committed; or imposes

additional punishment to that then prescribed.'"  *United States v. Ristovski*, 312 F.3d 206, 210

(6th Cir. 2002) (quoting *Weaver v. Graham*, 450 U.S. 24, 28 (1981)); *see Dobbert v. Florida*,

432 U.S. 282, 293-94 (1977).  Only Bosnian law governs the charge and punishment prescribed

for Nezirovic's Bosnian crimes.  They are unaffected by the United States statute; no U.S. *ex*

*post facto* protections can lie.  As detailed above, extradition seeks only to deliver a fugitive to a

foreign government for adjudication of a charged offense.

Indeed, because extradition is not punishment for crime, "all talk of ex post facto

legislation . . . *is quite beside the mark*."  *Oppenheim*, 16 F.2d at 955 (citing *Glucksman v.*

*Henkel*, 221 U.S. 508 (1911); *Grin v. Shine*, 187 U.S. 181 (1902)) (emphasis added).  *See also*

*Grin*, 187 U.S. at 184 (noting that "proceedings for a surrender are not such as put in issue the

life or liberty of the accused"); *McMullen*, 989 F.2d at 612 ("[T]he extradition proceeding

culminates in a 'surrender' to the foreign government rather than in punishment of any sort.");

*Jhirad*, 536 F.2d at 484 ("It is well to remember that [the fugitive's] ultimate culpability will not

be determined in the United States.").  As the court further noted in *Oppenheim*:  "Extradition

proceedings are not in their nature criminal, even if the relator is a criminal; extradition is not

punishment for crime, though such punishment may follow extradition."  16 F.2d at 956.

Applying this clear authority, courts have consistently rejected *ex post facto* claims by

fugitives fighting extradition.  *See e.g.*, *Ramnath*, 533 F. Supp. 2d at 672-73 (noting that because

the *ex post facto* clause refers to *Congress's* power, this protection "has *no application* to

international treaties or to criminal laws in the [requesting state]," and terming an "obvious flaw"

in the argument the fact that a change in law "in no way criminalized an action that was legal

when it was committed") (citing *Neely*, 180 U.S. at 122-23) (emphasis added); *Hilario*, 854 F.

Supp. at 175-76 (reiterating that because extradition proceedings are not criminal, a fugitive's

challenge could not actually even "invoke the Ex Post Facto Clause[] or any other constitutional

protection"); *In the Matter of the Request for Extradition of McMullen*, 769 F. Supp. 1278, 1292

(S.D.N.Y. 1991), *rev'd on other grounds* ("[T]he *ex post facto* clauses have been narrowly

construed to apply only to retroactive *criminal penalties*") (emphasis added); *Ernst*, 1998 WL

30283, at *4-5 (noting that the argument that retroactive application of treaties violated the *ex post facto* clause had, for instance, "been universally rejected in this Circuit in more than 100 years of precedent," including where the new law "eliminate[d] a pre-existing defense to extradition").[11]

Nezirovic's conduct was illegal under Bosnian and United States law at the time those acts were committed. It was also illegal under Section 2340A for multiple years before Nezirovic even arrived in the United States. Defenses against extradition that "savor of technicality," *Bingham*, 241 U.S. at 517, are "peculiarly inappropriate in dealings with a foreign nation," *Shapiro*, 478 F.2d at 901-02; *see Skaftouros*, 667 F.3d at 160. Nezirovic's argument against applying Section 2340A has precisely that technical flavor and should be rejected—as, again, Judge Ballou correctly noted. (*E.g.*, Certification at 22); *see also Johanessen*, 225 U.S. at 242 (rejecting *ex post facto* challenge where "[t]he act makes nothing fraudulent or unlawful that was honest and lawful when it was done. It imposes no new penalty upon the wrongdoer."). Section 2340A, as to which no statute of limitations applies, is the most analogous U.S. statute and its (lack of) statute of limitations should be applied to Nezirovic's offense for purposes of Article VII. *See also, e.g.*, *Mujagic*, Case No. 5:12-mj-00529, Dkt. # 27, at 36-38 (analogizing to Section 2340A in its timeliness analysis under the Treaty).[12]

---

[11] Judge Ballou correctly followed this overwhelming line of authority as to the inapplicability of *ex post facto* considerations in the context of an extradition proceeding. He observed as to *Basic*, 2012 WL 3067466, upon which Nezirovic relies, Nezirovic Habeas Br. at 10, 12, 13, that the *Basic* decision cited "no authority" for its conclusion disregarding these cases, which was "contrary to the express language of the Extradition Treaty and the overwhelming authority holding that the law in force at the time of the demand controls the extradition analysis." (Certification at 21; *see also id.* at 22.)

[12] Contrary to Nezirovic's argument, *see* Nezirovic Habeas Br. at 12-13, there is no dual criminality requirement as part of the timeliness provision at Article VII of the Treaty. Article VII specifically addresses timeliness of the requesting foreign authority's criminal process, here

C.    The "Criminal Report" or "Charge" Of 1993 Tolled Any Statute Of Limitations
      That Might Be Applied

Any conceivable U.S. statute of limitations that might be applied to the Bosnian charge

has been tolled for Article VII purposes by the timely initiation of criminal proceedings in

Bosnia in the form of the January 12, 1993 "Criminal Report" (or "Charge").  As Bosnian

authorities make clear in their formal extradition request, the 1993 Criminal Report initiates

criminal proceedings in the Bosnian states, tolls statutes of limitations under Bosnian law, and is,

therefore, a sufficient step in the prosecution to toll any statute of limitations that might be

applied under U.S. law.  *See* 18 U.S.C. § 3282.  An analysis of the substance of the 1993

Criminal Report also demonstrates that it is the "functional equivalent" of a U.S. criminal

Information in initiating criminal proceedings against the accused, firmly settling that a time-bar

is foreclosed.

1.    The 1993 Criminal Report Initiated Criminal Proceedings

Nezirovic basically contends that the 1993 charging document was not issued by a

legitimate government and is not a "charge."  In support of his assertions, he relies on various

books that are not in the record and his geography expert's testimony at the extradition hearing

that the Republika Srpska was not an internationally recognized legal entity in 1993 and was in

fact at war with Bosnia until the Dayton Peace Accords were signed in 1995.  These arguments

---

under an American-law lens.  The Treaty is a "list" treaty, (*see* Case No. 7:12-mc-00039, Dkt. #
18, at 5, 22-25; *id.*, Dkt. # 18-2, at 2-3; *id.*, Dkt. # 23, at 6-7; Treaty, Art. II; Certification at 8-
10), and courts need only inquire whether "the offense stated in the complaint is among those
listed as an extraditable offense in the treaty."  *In the Matter of Assarsson*, 635 F.2d 1237, 1240
(7th Cir. 1980).  By virtue of the CAT, torture is also deemed a "listed" offense, which Nezirovic
admits.  Even in treaties which do contain a separate dual criminality provision, such provisions
and a timeliness provision must not be conflated.  *Theron v. United States Marshal*, 832 F.2d
492, 499 (9th Cir. 1987) (noting that the dual criminality and statute-of-limitations inquiries are
"distinct"); (*see also*, e.g., Certification at 7-11 (analyzing the Treaty in this manner).)

miss the mark. Nezirovic's witness before Judge Ballou was a non-lawyer and was not qualified to opine about the legal effect of such a charging document—and none of Nezirovic's other, extra-record arguments or melodramatic insinuation casts any doubt on the Bosnian authorities' presentation or Judge Ballou's well-reasoned Certification. *See* Nezirovic Habeas Br. at 21-25.

Indeed, the legal interpretations of the requesting foreign authority as to its own law are entitled to deference. *See, e.g.*, *Skaftouros*, 667 F.3d at 156 ("Any arguments regarding the demanding country's compliance with its own laws . . . are properly reserved for the courts of that country"); *Spatola v. United States*, 925 F.2d 615, 618 (2d Cir. 1991) (casting such considerations in terms of international comity); *In the Matter of Assarsson*, 635 F.2d 1237, 1243 (7th Cir. 1980). As Judge Ballou noted: "It would be a grave insult for this court to presume to tell the Government of Bosnia and Herzegovina what is or is not legitimate under Bosnian law." (Certification at 26.)

As a sitting public official in the very jurisdiction where the Bosnian matter is pending, Prosecutor Berberovic provides authoritative information as to the significance of the 1993 document in Bosnia. He specifically indicates that the legal steps taken against Nezirovic by the Republika Srpska in 1993 are valid in Bosnia today:

> Pursuant to the Criminal Code of Bosnia [], the running of the period set by the statute of limitation is interrupted by every motion that relates to the prosecution of the perpetrator on account of the criminal offence perpetrated. The motion, in the broader sense of that word, relates to all activities undertaken by authorized bodies or persons – procedural subjects aiming at the initiation, duration and completion of the criminal proceeding. Given that the criminal report No. 13/93 of 12.01.1993 was submitted by the authority competent to initiate criminal prosecution, in this particular case by the police or internal authorities which also include the Doboj Public Security Center, and that the criminal report is directed at the initiation of criminal proceedings against the suspects, including Almaz Nezirovic, based on which the criminal prosecution against a particular person is officially opened, it clearly follows that the submission of the criminal report pursuant to Article 151(6) of the Criminal Procedure Code by the Doboj Public

Security Center against Almaz Nezirovic constitutes a procedural action which interrupted the course of statute of limitations of criminal prosecution.

(Case No. 7:12-mc-00039, Dkt. # 39-1, at 5; *see also id.* at 5-8, 8-9.)  Nezirovic is entitled only to rely upon "explanatory" evidence in these proceedings, *see supra* at 16-17 n.7, and cannot (and does not) contradict the Bosnian authorities' summary.

As to the legal effect of the 1993 charge on any Bosnian statute of limitations, Prosecutor Berberovic recites:  "The criminal report functions to initiate beginning of a criminal prosecution under the law of Bosnia and Herzegovina and the law of the Republika Srpska and is sufficient to toll any statute of limitations under Bosnian or Republika Srpska law."  (Case No. 7:12-mc-00039, Dkt. # 39-1, at 3.)  Further, "[b]ecause there is no statute of limitations applicable to war crimes in Bosnia and Herzegovina or in Republika Srpska, the charges could have been brought at any time.  In this case, the criminal charge was brought on January 12, 1993 and, if a statute of limitations had been applicable, it would have been tolled since that date." (*Id.*)  Judge Ballou analyzed this issue and found that "the 1993 Charging Document would toll any applicable statute of limitations."   (Certification at 27.)

Because the Bosnian charges were "initiated" timely, Article VII does not apply.  In extradition proceedings, "where a step is taken in a foreign legal system to toll the statute of limitations[,] that step also tolls the limitations period under United States law."  *Cherry v. Reish*, No. 96-CIV-1679, 1996 WL 509735, at *3 (S.D.N.Y. Sept. 9, 1996) (noting that under the Swiss Penal Code, "the limitation period is interrupted by certain acts of *any authority in charge of the suit*, including any decision directed against the accused and the issuance of warrants of arrest,"

and finding the requirement satisfied) (citing *Caplan v. Vokes*, 649 F.2d 1336, 1340-41 (9th Cir.1981)) (emphasis added); (*see also* Certification at 23-25).[13]

This Court should provide the appropriate substantial deference to Judge Ballou's findings of fact, follow his sound reasoning, and rely on the 1993 criminal charge and the authoritative, uncontradicted views of the Bosnian prosecutor regarding the initiation of proceedings in this case. *See, e.g.*, *Assarsson*, 635 F2d at 1244 ("We are also not expected to become experts in the laws of foreign nations."); *Murphy*, 1998 WL 1179109, at *4 (relying on the foreign prosecutor's affidavit that the charges were validly stated under foreign law); *supra* at 25. The 1993 Criminal Report was filed soon after the alleged offense, charging the same crime for which extradition is currently sought. The views of the requesting foreign authority that the 1993 Criminal Report initiated criminal proceedings against Nezirovic is more than sufficient to satisfy the Treaty's timing provision, as Judge Ballou found.

      2.    <u>The Criminal Report Is The "Functional Equivalent" Of A U.S.<br>Information; Both Initiate The Criminal Charges</u>

Nezirovic claims, as he did before Judge Ballou, that the Criminal Report is not sufficient to stop the statute of limitations from running because it is not the "functional equivalent" of an arrest warrant or indictment. Nezirovic Habeas Br. at 15-21. He thus asks U.S. courts to look behind the Bosnian process, the facial validity of the 1993 Criminal Report, and the authoritative opinion of the Bosnian government as to an issue of foreign law. However, "it has long been recognized that an extradition judge should avoid making determinations regarding foreign law"

---

[13]    The fact that the 1993 Criminal Report was reviewed by an international war crimes tribunal (as were the same or comparable documents in *Basic* and *Mujagic*), *see* Nezirovic Habeas Br. at 24, further strengthens its legitimacy. Prosecutor Berberovic describes the ICTY process in his affidavit at pages 6-7. This objective review provides further rebuttal to Nezirovic's argument that the 1993 charge was somehow illegitimate as it was issued by a government that was not internationally recognized at the time.

due to the interests of international comity and judicial modesty in extradition matters.

*Skaftouros*, 667 F.3d at 156. Such determinations are acceptable "to the limited extent necessary" to ensure compliance with an applicable treaty, *id.* at 156, 163, but here the Court should rely, as did Judge Ballou, on the Bosnian statement regarding the legal import of its own processes discussed above. (*See, e.g.*, Certification at 24.)

To the extent the Court chooses to engage in this analysis, the precise issue involved in this matter—the validity and "functional equivalence" of the very same 1993 charging document in the timeliness inquiry—had been previously resolved by a United States Magistrate Judge in the Eastern District of Kentucky in the same manner as Judge Ballou resolved it here. In *Basic*, the Court reviewed the very same document at issue in this matter, which charged Nezirovic, Basic, and 125 other individuals with alleged war crimes. In assessing the "functional equivalence" of this 1993 charging document, the Court properly concluded that it sufficed to toll the statute of limitations. *See Basic*, 2012 WL 3067466, at *15-16. As that court noted, "[w]hile charge initiation under federal law requires an indictment or Information, the BiH system plainly does not align with American procedure." *Id.* at *15. "The question becomes whether BiH took an act to formally initiate prosecution, such that the Court can find tolling to have occurred during the limitations period." *Id.* Instead of "prob[ing] for a technically corresponding indictment under BiH law," the court concluded it "merely must gauge whether its 'functional equivalent,' *an initiating document*, exists." *Id.* (emphasis added). The Criminal Report is such an initiating document, and the court properly relied on it in the statute of limitations analysis. *See id.*[14]

---

[14]    Nezirovic insinuates that a different document is at issue because the *Basic* court used the term "Criminal Charge" rather than "Criminal Report." *See* Nezirovic Habeas Br. at 19; (Case

The 1993 Criminal Report not only "constitutes the first charging document submitted by the relevant authority," but also was the foundation for the subsequent steps taken in Nezirovic's case.  (Case No. 7:12-mc-00039, Dkt. # 39-1, at 5; *see also id.* (noting that the subsequent actions and orders issued, including specifically by the Investigative Judge in 2003, were "[b]ased on this report and the investigative actions initiated for the purpose of checking the allegations from the report"), 5-9; *id.*, Dkt. # 18-4, at 15.)  Accordingly, the Criminal Report is akin to a U.S. criminal Information, which would suffice to initiate proceedings and toll a U.S. statute of limitations.  Hence, it satisfies the "functional equivalence" test.

Courts have regularly found that foreign arrest warrants constitute "functional equivalents" of U.S. indictments such that they similarly would toll a U.S. statute of limitations for purposes of extradition treaties.  *See, e.g.*, *Sainez*, 588 F.3d at 716-17; *Bertrand*, 1986 WL 8845, at *4-6.  In *Bertrand*, upon which Nezirovic relies, the court concluded:  "That the Swiss international arrest warrant appears to meet or exceed the[] requirements [in Fed. R. Crim. P. 7(c)(1)] by providing the factual basis for the charges and identifying the precise statutes violated"—as the 1993 charge does here—"suggests that its form and content are analogous to an indictment or Information in the United States."  1986 WL 8845, at *5.  Such cases have arisen where no charge had been brought and the courts were evaluating whether an arrest

---

No. 5:12-mj-00039, Dkt. # 37, at 6 n.1).  The Bosnian authorities directly addressed this argument:  "English expressions *criminal charge* and *criminal report* are used as synonyms and interchangeably for Bosnian translation of the expression criminal report in the sense of the Criminal Procedure Code, and they have identical meaning."  (Case No. 7:12-mc-00039, Dkt. # 39-1, at 4; *see* Certification at 27 n.5.)  The documents at issue here and in *Basic* are the same document, and a comparable document was at issue in *Mujagic* (simply issued in 1996, rather than 1993).  Further, contrary to Nezirovic's suggestion, Nezirovic Habeas Br. at 19, Basic vigorously challenged reliance on the 1993 charging document, but the court found it to govern the tolling of the statute of limitations in that case.  This Court should follow suit and adhere to the same appropriate analysis here.

warrant *alone* was sufficient to justify extradition.  Accordingly, the case law regarding arrest

warrants confirms and strengthens the clear analogy between the 1993 Criminal Report and a

U.S. charging document for purposes here.

The Restatement of Foreign Relations Law that Nezirovic quotes provides additional

support for our position, as it indicates that a statute of limitations period for extradition purposes

"'is generally calculated from the time of the alleged commission of the offense to the time of

the warrant, arrest, indictment, *or similar step in the requesting state*.'"  Nezirovic Habeas Br. at

15 (emphasis altered); (*see also* Case No. 5:12-mc-00039, Dkt. # 37, at 1-2 (quoting Restatement

(Third) of Foreign Relations Law § 476, cmt. 2 (1987)).  The tolling documents may vary based

on each country's law, and a formulaic comparison to U.S. indictments (or arrest warrants) alone

is simply not appropriate.  *See also Bertrand*, 1986 WL 8845, at *5 (noting that the U.S. system

of justice "incorporates indictments, informations, and common law concepts," whereas in civil

law systems, "these concepts are unknown"); *e.g.*, *In the Matter of the Extradition of Han*, No.

CV 11-2059-DMG, 2012 WL 33201, at *11 (C.D. Cal. Jan. 6, 2012) ("The United States is

correct that an indictment is not the only procedure that will stop the tolling of the limitations

period for purposes of extradition."); *e.g.*, *Wroclawski v. Clinton*, Case No. CV-09-977 (PHX),

Dkt. # 99, at 10 (D. Ariz. Dec. 30, 2011) (noting that "the issue is not what Polish document

most resembles an indictment under the laws of the United States;" "[t]he issue is *when*

*proceedings commenced* in Poland") (emphasis added), *aff'd*, 486 F. App'x 684.

Even the United States statute of limitations provision is not limited to indictments.

Section 3282(a) provides:  "Except as otherwise expressly provided by law, no person shall be

prosecuted, tried, or punished for any offense, not capital, unless the indictment is found *or the*

*information is instituted* within five years next after such offense shall have been committed."

(Emphasis added.)  The 1993 criminal charge, analogous to a U.S. criminal Information, would satisfy such language on its own terms.  Indeed, in *Sainez*, the court found that a Mexican arrest warrant was "the equivalent of a United States indictment and may toll the United States statute of limitations."  588 F.3d at 717; *accord, e.g.*, *United States v. Kraiselburd*, 786 F.2d 1395, 1397 (9th Cir. 1986) (finding that a request for provisional arrest issued by Argentina, and which was directed to Argentinian police authorities, was satisfactory).

Nezirovic does not challenge the 1993 criminal charge as failing to include any particular necessary information; instead, he simply attempts to differentiate it on the grounds that it was not signed by a third party and did not authorize his immediate arrest.  Nezirovic Habeas Br. at 16.  His attempt to distinguish the 1993 report must fail, however, as the substance of the 1993 document accomplishes the same purposes as a criminal Information or Indictment.  A U.S. Information contains the same charging information as an Indictment under Federal Rule of Criminal Procedure 7(c)(1), but is not generally accompanied by an arrest warrant and is not issued by a judicial officer.  It is issued by a prosecutor instead.[15]

As the court noted in affirming that an arrest warrant qualified as a charge in *Assarsson*, "*[i]t is not a case of mere suspicion*; it is a case where probable cause has been found by the

---

[15]       The fact that Bosnia's procedures *do not allow an indictment* before the fugitive is interviewed further supports the conclusion that the 1993 document is appropriate to rely upon here.  (*See* Case No. 7:12-mc-00039, Dkt. # 18-4, at 6.)  As another court reasoned, "[t]o bar extradition based on the lack of an indictment by [Bosnia] would lead to an unwarranted result," creating a self-defeating system in which fugitives who fled to the United States before indictment could never be extradited because they could never be indicted.  *Handanovic*, 829 F. Supp. 2d at 987.  Not only would such a result "effectively eviscerate the 1902 Treaty and render the United States an attractive haven for [Bosnian] fugitives," but also it would "violate the requirement that extradition treaties 'be construed more liberally than a criminal statute or the technical requirements of criminal procedure' in favor of carrying out a treaty obligation."  *Id.* (quoting *Factor*, 290 U.S. at 293); *see also Sacirbey v. Guccione*, 589 F.3d 52, 63-69 (2d Cir. 2009) (outlining relevant case law); *In the Matter of the Extradition of Sacirbegovic*, No. 03 CR. MISC. 01, 2005 WL 107094, at *15-17 (S.D.N.Y. Jan. 19, 2005).

Swedish judge." 635 F.2d at 1240 (emphasis added). As with the document at issue in *Assarsson*, the Criminal Report establishes probable cause and surpasses any barrier of "mere suspicion." The document "is the first charging document which, in accordance with the Criminal Procedure Code was prepared by police and which contained allegations based on which it could be concluded that there existed *sufficient grounds for suspicion that a particular person commit[t]ed [sic] a criminal offence*." (Case No. 7:12-mc-00039, Dkt. # 39-1, at 3 (emphasis added); *see also id.*, Dkt. # 18-4, at 14-15; *id.* at 15 ("Pursuant to our law, the first charging document is a criminal report prepared by the police which contains allegations based on which it can be concluded that there exists sufficient grounds for suspicion that a particular person could have committed a criminal offence.").) The 1993 Criminal Report amply satisfies the Treaty's timing requirements in this case.[16]

## IV.   NEZIROVIC'S CONDUCT DOES NOT FALL WITHIN THE POLITICAL OFFENSE EXCEPTION

Article VI of the Treaty applicable here directs that "[a] fugitive criminal shall not be surrendered if the offense in respect of which his surrender is demanded be of a political

---

[16]   Even if a statute of limitations under American law did apply to Nezirovic's conduct and it were not otherwise tolled, he similarly would have tolled that limitations period by fleeing Bosnia to the United States. Under federal law, "[n]o statute of limitations shall extend to any person fleeing from justice." 18 U.S.C. § 3290; *see, e.g., Assarsson*, 687 F.2d at 1162 (finding this test satisfied based on the subject's absence from the jurisdiction alone); *McGowen v. United States*, 105 F.2d 791, 792 (D.C. Cir. 1939) (same). Nezirovic departed Bosnia in October 1992 and has remained unavailable to the Bosnian authorities since that date. (*See* Case No. 7:12-mc-00039, Dkt. # 18-4, at 6.) Because his absence from Bosnia thwarted efforts to "interview . . . and formally indict" (*id.*) Nezirovic, the record demonstrates that he was "fleeing from justice" and hence tolled the limitations period. *See, e.g., Jhirad*, 536 F.2d at 483-85; *In the Matter of Extradition of Lang*, 905 F. Supp. 1385, 1402 (C.D. Cal. 1995) ("[T]he fact that [the fugitive] used his true name here is not dispositive."). "[A] defendant's 'intent to flee from prosecution or arrest may be inferred from a person's failure to surrender to authorities once he learns that charges against him are pending.'" *United States v. Duff*, 931 F. Supp. 1306, 1312 (E.D. Va. 1996); *see also Bertrand*, 1986 WL 8845, at *9.

character" or if he proves that extradition is sought "to try to punish him" for such an offense. As the Fourth Circuit has explained, this exception "forbids countries from extraditing people who are accused of offenses that are 'political' in nature." *Ordinola*, 478 F.3d at 595.  The political offense exception is rarely applied.  *See McMullen*, 769 F. Supp. at 1287 n.10.

Nezirovic's alleged acts of torture involving the physical and emotional abuse of unarmed Serbian civilians in captivity are inherently inconsistent with any claim that his conduct constitutes a "political offense" within the protection of Article VI.  The political offense exception does not apply, as a matter of law, to the conduct alleged.  Further, Nezirovic's testimony at the extradition hearing, and Judge Ballou's findings based upon that testimony, which are entitled to substantial deference, make clear that the exception does not otherwise apply to Nezirovic, either.  As Judge Ballou found, "Nezirovic did not enlist in the army for any deep-rooted political reason," and "Nezirovic's alleged conduct of beating, degrading and humiliating prisoners went well beyond his duties to guard the prisoners."  (Certification at 31, 33.)  As a mixed question of law and fact, much deference is due Judge Ballou's assessment of the evidence before him.  Nezirovic's second challenge to the Certification also fails.

A.    Torture of Unarmed Civilians Is Beyond The Scope Of The Exception

Any effort to claim that the repeated torture of unarmed civilian prisoners is somehow a "political offense" is an affront to norms of international law.  The prohibition against torture is "a right deserving of the highest status under international law, a norm of *jus cogens*."  *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 717 (9th Cir. 1992).  *Jus cogens* norms are also referred to as "peremptory norms" of international law.  *See id.* at 714.  Article 53 of the Vienna Convention on the Law of Treaties defines a peremptory norm as "'a norm accepted and recognized by the international community of states as a whole as a norm from which no

derogation is permitted and which can be modified only by a subsequent norm of general international law having the same character.'"  *Id.* (quoting Vienna Convention on the Law of Treaties, done at Vienna May 23, 1969 and entered into force January 27, 1980, 1155 U.N.T.S. 332).

Currently, there are 154 parties to the CAT, nearly 80% of the 193 member states of the United Nations.  Torture is also considered a grave breach under each of the Geneva Conventions, when committed against persons protected by the relevant Convention, and the Conventions now have virtually global membership.  *See, e.g.*, Geneva Convention relative to the Protection of Civilian Persons in Time of War (IV), Aug. 12, 1949, 6 U.S.T. 3516, 75 U.N.T.S. 287, Art. 147.  Article 2(2) of the CAT similarly reads as follows:  "No exceptional circumstances whatsoever, whether a state of war or a threat of war, internal political instability or any other public emergency, may be invoked as a justification of torture."  CAT, Art. 2, § 2. Likewise, Article 2(3) states clearly that "[a]n order from a superior officer or a public authority may not be invoked as a justification of torture."  *Id.*, Art. 2, § 3.  Ultimately:  "[T]he prohibition on torture is categorical:  Even in war, torture is not authorized."  *Nuru v. Gonzales*, 404 F.3d 1207, 1222 (9th Cir. 2005).

The political offense exception is not available as a justification for torture or as a vehicle for obtaining immunity for acts of torture.  To recognize torture, under any circumstances, as a legitimate political offense would frustrate the object and purpose of the CAT, which creates an international treaty regime for accountability for violations of this peremptory norm of international law.  Also, "[t]he objective evidence in this case establishes that Nezirovic's alleged victims were civilians."  (Certification at 32.)  Even if the individuals at issue had been combatants at some point (a question for the Bosnian courts upon trial on the merits rather than

34

for the United States), the political offense exception cannot apply because of the nature of the offenses charged.  (*See, e.g.*, Case No. 7:12-mc-00039, Dkt. # 18, at 36-37.)  Based upon the status of torture as an act violative of a norm of *jus cogens*, it is unnecessary to further analyze the political offense exception here.  Torture as alleged to have been committed by Nezirovic in not within the political offense exception.

B.     Case Law Confirms That The Alleged Conduct Here Cannot Constitute A Political Offense

While it is generally incorrect to engage in a traditional analysis of the political offense exception given the above authority, case law bears out that the political offense exception is not available in this matter even under that traditional analysis—as Judge Ballou correctly found. (Certification at 31-34.)  In an extradition proceeding, the fugitive "bears the burden of proof to establish the essential elements of the political offense exception." *Arambasic v. Ashcroft*, 403 F. Supp. 2d 951, 957 (D.S.D. 2005); *see also Barapind v. Enomoto*, 400 F.3d 744, 752 (9th Cir. 2005); *Ahmad*, 726 F. Supp. at 408.  In the event that a fugitive makes such a showing to "establish[] the essential elements of the political offense exception, the burden [then] shifts to the demanding government to prove the crimes charged in the complaint were not of a political character." *Arambasic*, 403 F. Supp. 2d at 957.

There are two types of political offenses, "pure" and "relative."  The typical "'pure' political offenses are treason, sedition, and espionage," and these offenses "do not have any of the elements of a common crime because" they can only be directed at the state itself. *Ordinola*, 478 F.3d at 596.  "'Relative' political offenses, on the other hand, are common crimes that are so intertwined with a political act that the offense itself becomes a political one." *Id. See Quinn*,

783 F.2d at 792-814 (outlining these categories and the exception's history); *Eain*, 641 F.2d at 512.

The Fourth Circuit has adopted an "incidence test" for determining whether an offense is sufficiently political to fall within the "relative" political offense category, asking whether: "(1) there was a violent political disturbance or uprising in the requesting country at the time of the alleged offense, and if so, (2) whether the alleged offense was incidental to or in furtherance of the uprising." *Ordinola*, 478 F.3d at 597; *see Eain*, 641 F.2d at 512-13, 515-16; *Arambasic*, 403 F. Supp. 2d at 960. Because the political offense exception was designed "to protect those people who justly fought back against their government oppressors to secure political change," *Ordinola*, 478 F.3d at 596, courts apply the exception carefully in other contexts in order to avoid having it subjected to the "abuse[]" of "operat[ing] to protect common criminals simply because their crimes occur during times of political disorder," *Eain*, 641 F.2d at 519; *see also Ahmad*, 726 F. Supp. at 403 (emphasizing the need "to insure that the exception does not afford immunity to those who commit atrocities for political ends").

In determining whether an offense is political under this objective prong of the test, courts "focus[] on such particulars as the mode of the attack and the identity of the victims." *Ordinola*, 478 F.3d at 601; *see also Ornelas*, 161 U.S. at 510-12 (considering such factors). "[I]f the act complained of is of such heinous nature that it is a crime against humanity, it is necessarily outside the political offense exception." *Marzook*, 924 F. Supp. at 577-78. To determine whether a crime is "heinous" and "against humanity," courts have looked to the provisions of the Geneva Conventions. *See, e.g.*, *id.*; *supra* at 34; *Mujagic*, Case No. 5:12-mj-00529, Dkt. # 27, at 43-46; *id.* at 46 (concluding that "[a]ccordingly, because the allegations contained in BiH's extradition request are sufficient to allege that [the fugitive's] conduct . . .

violated international law, his extradition is not precluded by the political offense exception of the 1902 Treaty").

The fact that Nezirovic allegedly tortured civilians conclusively removes Nezirovic's conduct from the realm of the political offense exception under the case law, as there can be no justifiable connection between attacks against civilians and a political disturbance or uprising. "[A]ttacks targeted at civilians do not advance any political motive other than as terrorist acts." *Marzook*, 924 F. Supp. at 577-78; *Ahmad*, 726 F. Supp. at 394 (recognizing the then-recent "change in law" to the effect that "the 'political offense' bar to extradition is narrowed to exclude . . . acts of war against civilians"). The political offense exception simply does not apply to abhorrent attacks against civilians. *See Ordinola*, 478 F.3d at 601; *Barapind v. Enomoto*, 360 F.3d 1061, 1075 (9th Cir. 2004) ("[T]he political offense exception is 'inapplicable to shield the knowing effort to kill or injure unarmed, uninvolved, innocent civilians who are non-combatants in the struggle.'") (quoting *In the Matter of the Extradition of Singh*, 170 F. Supp. 2d 982, 1036 (E.D. Cal. 2001) (collecting cases)).

If this were not the case, "isolated acts of social violence undertaken for personal reasons would be protected simply because they occurred during a time of political upheaval, a result we think the political offense exception was not meant to produce." *Eain*, 641 F.2d at 521; *see Ordinola*, 478 F.3d at 603 n.15; *Demjanjuk*, 612 F. Supp. at 570 (calling the claim that the respondent's "killing of defenseless civilians" was "political in character" "frivolous and offensive").

The Bosnian submission makes clear, and Judge Ballou found, that Nezirovic's victims were civilians, (Case No. 7:12-mc-00039, Dkt. # 18-4, at 6, 14-16 (describing the charge), 14 (noting the prisoners' civilian status); *id.*, Dkt. # 39-1, at 10; Certification at 32.) Indeed, the

victims' testimony is treated as true for purposes of these proceedings, *see supra* at 16-17 n.7—despite Nezirovic's insinuation to the contrary, *see* Nezirovic Habeas Br. at 4.  Further, the Geneva Convention relative to the Protection of Civilian Persons in Time of War, Aug. 12, 1949, 6 U.S.T. 3516, 75 U.N.T.S. 287 ("Geneva Convention (IV)"), to which the United States became a signatory in 1949, specifically prohibited acts against civilians *such as* "[p]ersons taking no active part in the hostilities, including members of armed forces who have laid down their arms and those placed hors de combat by . . . detention, or any other cause . . . ."  1949 Geneva Convention (IV), Art. 3(1); (Certification at 32).  That convention prohibits "violence to life and person, in particular . . . cruel treatment and torture" and "outrages upon personal dignity, in particular humiliating and degrading treatment."  *Id.*

Even where "attacks by military units *on other combatants* would be acts of a political character," "[p]olitical strife is not a license for the military or anyone else to do whatever they wish to the defenseless that have come under their power."  *Arambasic*, 403 F. Supp. 2d at 963; *see also, e.g.*, *In the Matter of the Requested Extradition of Suarez-Mason*, 694 F. Supp. 676, 707 (N.D. Cal. 1988) (rejecting applicability of the political offense exception where, "even if there were evidence that these [victims] had been involved in an uprising, they" were in custody at the time of the charged offenses and were therefore "not a military threat") (citation and quotation marks omitted); (Certification at 32-33).

Nezirovic's torture of Serb prisoners is comprised of heinous acts which fall well outside of the political offense exception.  He is alleged to have physically and emotionally abused unarmed Serbian civilians secured in captivity.  His alleged acts of torture went well beyond the prosecution of an armed conflict.  Acts of torture, as defined in the CAT and the Geneva Conventions, are offenses that are not "political" and are not entitled to the protection of this

provision of the Treaty.  *See Atta*, 706 F. Supp. at 1042 ("'Surely an act which would be properly punishable even in the context of a declared war or in the heat of open military conflict cannot and should not receive recognition under the political exception to the Treaty.'") (quoting *In the Matter of the Requested Extradition of Doherty*, 599 F. Supp. 270, 274 (S.D.N.Y. 1984)); *Doherty*, 599 F. Supp. at 274 (construing the applicable law to "require[] that no act be regarded as political where the nature of the act is such as to be violative of international law, and inconsistent with international standards of civilized conduct").

In the face of this clear authority and Judge Ballou's rejection of his position, Nezirovic presses on with his claim that his offense was one of a political character.  Essentially, however, Nezirovic is relying on the existence of political strife alone.  *See* Nezirovic Habeas Br. at 25-38; (Case No. 7:12-mc-00039, Dkt. # 19, at 1, 11, 16-19).  Even had Nezirovic testified that his acts of torture were somehow incidental to or in furtherance of the uprising—which he did not, as described below—the political offense exception is inapplicable to crimes of torture as a matter of law.  His argument in no manner displaces the extensive authority regarding the inapplicability of the political offense exception to crimes against humanity or to abhorrent attacks against civilians.  Further, the fact that other individuals also committed horrific acts does not make Nezirovic less culpable for his own criminal conduct in this case.  (*See also* Certification at 33-34.)  All of Nezirovic's efforts to establish the exception should be rejected.[17]

---

[17]     The United States government's position on the issue of protected political activity is entitled to deference.  *See also supra* at 15 n.6.  As the Fourth Circuit explained, "we must afford 'great weight' to the meaning attributed to [a treaty] provision by the State Department, as it is charged with enforcing the Treaty."  *Ordinola*, 478 F.3d at 603.  The State Department has expressed the clear view that "'the political offense exception is not applicable to violent attacks on civilians.'"  *Id.* (citing *Ahmad*, 726 F. Supp. at 402); *see also Atta*, 706 F. Supp. at 1039 & n.5.

C.     Nezirovic's Testimony At The Extradition Hearing Made Clear That The
       Exception Does Not Apply To Him, And The Magistrate Judge's Factual
       Finding Regarding His Motivation Is Entitled To Deference

Assuming that the nature of the alleged offenses does not end the inquiry here, to establish that an offense is "political" within the provisions of this and other Treaties, the fugitive must establish not only that there was a political disturbance or uprising at the time of the offense, but also that "the alleged offense was incidental to or in furtherance of the uprising." *Ordinola*, 478 F.3d at 597.  "[T]he 'incidental to' component is not satisfied by 'any connection, however feeble, between a common crime and a political disturbance.'  The act must be causally or ideologically related to the uprising." *Quinn*, 783 F.2d at 809 (citation omitted). *See also, e.g.*, *In the Matter of the Extradition of Koskotas*, 127 F.R.D. 13, 19 (D. Mass. 1989) (citing *Ornelas*, 161 U.S. 502), in connection with this principle, "where the Supreme Court held that the political exception did not apply because the offenses charged did not constitute 'a movement *in the aid of* a political revolt, an insurrection or a civil war' and the petitioners were not engaged in armed combat when the alleged crimes were committed") (emphasis added).

In attempting to show that he met his burden to establish the applicability of the political offense exception, Nezirovic claims in his brief that he was subjectively motivated by "the desire to defend his homeland and prevent the destruction and cleansing of his town" or, for instance, "for the purpose of opposing and trying to quash the Serbian attack on Bosnia," or, for instance, somehow to "help the Bosnian government repel the Serbian attack." *See, e.g.*, Nezirovic Habeas Br. at 4, 5, 27-29, 32, 38; (Case No. 5:12-mc-00039, Dkt. # 37, at 20).  His testimony at the evidentiary hearing, however, proved the opposite—as Judge Ballou found, and Judge Ballou's findings in this area are entitled to great deference. *See, e.g.*, *Meza v. Attorney General*, 693 F.3d 1350, 1356 (11th Cir. 2012) (quoting *Ordinola*, 478 F.3d at 598, for the principle that

"'[w]e must grant a magistrate's factual findings great deference and affirm the decision unless it is "palpably erroneous in law" and a reasonable factfinder would have had "no choice" but to conclude that the offender was acting in furtherance of a political uprising'").

In describing why he joined the HVO, Nezirovic did not cite any political agenda, or any "side" that he wanted to help; only a desire for personal protection for himself and his family. (Transcript at 122.)  Nezirovic's personal purpose to defend his family does not place his conduct in the context of the political.  In fact, he disclaimed any such motivation.  He specifically testified:  "I joined – that moment I joined any army which can defend *me and my family; it doesn't matter who and what*, you know."  (*Id.* (emphasis added).)  Personal motivations that are not causally or ideologically related to a political purpose or uprising do not place conduct within the exception.  Thus, Judge Ballou properly concluded that "Nezirovic did not enlist in the army for any deep-rooted political reason."  (Certification at 31.)  This and his other factual findings are entitled to substantial deference.  *See also supra* at 9-12.

Nezirovic's emphasis on why he may have *joined the HVO*, moreover, misses the mark. *See* Nezirovic Habeas Br. at 4, 27 (relying on certain explanations as to why Nezirovic purportedly "joined the HVO"), 29, 30.  The relevant question for purposes of evaluating the political offense exception is rather what motivated *the offense charged.  See Eain*, 641 F.2d at 520.  Nezirovic nowhere offered any explanatory evidence regarding the charged crime and his acts against detained Serb civilians.  Accordingly, he does not satisfy the applicable test.

Nezirovic's present elaboration of his purported motives in joining the HVO and regarding the specific witnesses against him, *see, e.g.*, Nezirovic Habeas Br. at 4-5, 27-29, 32, 38; (Case No. 7:12-mc-00039, Dkt. # 19, at 6, 17-18, 19), moreover, pertains to the merits of the charge in Bosnia and is beyond the scope of this Court's consideration.  Even assuming that

41

Nezirovic *had* proffered a political rationale for his action, the political offense exception

"cannot be read to protect every act—no matter how unjustifiable and no matter the victim—

simply because the suspect can proffer a political rationale for the action."  *Ordinola*, 478 F.3d at

600 (citing *Ahmad v. Wigen*, 910 F.2d 1063, 1066 (2d Cir. 1990) ("Political motivation does not

convert every crime into a political offense."); *Eain*, 641 F.2d at 520-21 ("[E]ven when the larger

'political' objective of the person who sets off the bomb may be to eliminate the civilian

population of a country," it is clear that "the indiscriminate bombing of a civilian populace is not

recognized as a protected political act.")*; Escobedo*, 623 F.2d 1098, 1104 (5th Cir. 1980) ("An

offense is not of a political character simply because it was politically motivated.").

     If Nezirovic could overcome the nature of the charged acts and had espoused a subjective

political motivation as to the particular torture crimes allegedly committed, moreover, that would

not end the inquiry.  "A court may not rely on a fugitive's mere assurance that a crime had some

political purpose."  *Solis*, 402 F. Supp. 2d at 1130.  Indeed, in *In the Matter of the Extradition of*

*Artukovic*, 628 F. Supp. 1370 (C.D. Cal. 1986), the court rejected a claim that murders were of a

political character where evidence showed, instead, that "they were for personal gain, racial or

religious hatred, and/or impermissible vengeance upon disarmed enemy soldiers."  *Id.* at 1376.

     Nezirovic failed to establish any objective connection between his actions in the Rabic

camp and any political purpose.  Nezirovic's political offense objection is plainly inconsistent

with his own testimony at the evidentiary hearing that his "job as a guard" was "*[j]ust keeping*

*the people locked up*."  (Transcript at 124 (emphasis added); *see* Certification at 31-33.)  His

role, even if it could be classified as a political one otherwise, was *not* to break the victims'

fingers, *not* to avenge past perceived wrongs, *not* to beat, degrade, or humiliate the prisoners—

nor, as he has now claimed in his habeas petition, to serve any other purpose in the war effort.

His conduct went well beyond guarding prisoners.  It extended to cruel, inhumane, and

degrading conduct that caused lifelong injury to his victims.  "[R]egardless of the prisoners'

civilian status, Nezirovic failed to establish an objective connection between his alleged actions

at the Rabic camp and a political purpose," and this finding by Judge Ballou, as with his other

factual findings, is entitled to substantial deference here.  (Certification at 33.)  Because

Nezirovic failed to establish a causal or ideological relationship between his crimes and a

political disturbance or uprising, the political offense exception cannot apply.[18]

       D.      No "Proportionality" Test Applies Or Justifies Nezirovic's Conduct

Nezirovic's suggestion that his abhorrent conduct might have been justified as retribution

proportional to the conduct of others in the Bosnian conflict also lacks a legal basis, would lead

to ludicrous results, and should be emphatically rejected.  *See, e.g.*, Nezirovic Habeas Br. at 26,

35.  The conduct of others in that conflict, even if abhorrent, does not justify Nezirovic's alleged

acts.  His suggestion to the contrary can only be characterized as a claim that two wrongs make a

right, which is not the law and would lead to despicable results.  Nor does his attempt to

"defend" his actions, seemingly on the grounds that they could have been different or worse, *see*

Nezirovic Habeas Br. at 30-31 (noting various atrocities that he did not commit), provide any

defense under the law.  Nezirovic cannot successfully invoke the exception here.

---

[18]    Nezirovic speculated in his post-hearing submission to Judge Ballou that the alleged conduct might have furthered a cause "[b]y sending the message to other combatants that their behavior was not acceptable," or by debilitating combatants' trigger fingers.  (Case No. 5:12-mj-00039, Dkt. # 37, at 21.)  That assertion was flatly inconsistent with his hearing testimony, which indicated that his purpose was simply "keeping the people locked up"—and he does not pursue it here.  However, it highlights that there is no evidence that his torture had any political motive whatsoever; it was cruelty, plain and simple.  This Court, like Judge Ballou, should refuse Nezirovic's post-hearing invitations to speculate as to his motivation or the impact of his conduct, as he specifically disclaimed such motivation in his own testimony.

In his brief, as before Judge Ballou, Nezirovic attempts to avoid answering for his crimes by way of the remarkable claim that his torture may not have been "'disproportional' to the violence, destruction, death, and ethnic cleansing that the Bosnian Serbs had inflicted and were inflicting and were continuing to inflict on Derventa." Nezirovic Habeas Br. at 29-30; (Case No. 5:12-mc-00039, Dkt. # 37, at 21; *see also id.* at 26). This audacious contention would be out of place even if Nezirovic's actions had taken place on a battlefield in the heat of battle. It certainly has no bearing in a case involving the torture of civilian detainees. Beating and terrorizing detained civilian prisoners does not further any protected purpose as a matter of law. As stated above, "[p]olitical strife is not a license for the military or anyone else to do whatever they wish to the defenseless that have come under their power." *Arambasic*, 403 F. Supp. 2d at 963 (rejecting the political offense exception in a claim arising from the same conflict); *Mujagic*, Case No. 5:12-mj-00529, Dkt. # 27, at 38-46 (same); (*see also* Certification at 33-34).

If accepted, Nezirovic's "proportionality" argument might be used to justify any atrocity by a victim of an offense, promoting only escalation and an "eye-for-an-eye" rationale for abhorrent conduct. Thankfully, this is not the law. If it were, "isolated acts of social violence undertaken for personal reasons would be protected simply because they occurred during a time of political upheaval, a result we think the political offense exception was not meant to produce." *Eain*, 641 F.2d at 521; *see also Ordinola*, 478 F.3d at 604 (endorsing the view that even the "legitimacy of a cause" does not "legitimize the use of certain forms of violence"). The political offense exception is simply "'inapplicable to shield the knowing effort to kill or injure unarmed, uninvolved, innocent civilians who are non-combatants in the struggle.'" *Barapind*, 360 F.3d at 1075. Further, the United States Department of State has expressed the clear view that "'the political offense exception is not applicable to violent attacks on civilians,'" *Ordinola*, 478 F.3d

at 603; *Atta*, 706 F. Supp. at 1039 & n.5, and that view is entitled to deference.  *See also Ahmad*,

726 F. Supp. at 394 (noting that the political offense exception has specifically evolved to

"exclude . . . acts of war against civilians").

Nezirovic's argument that his alleged acts "are not egregious enough to fall within the

'crimes against humanity' rubric," Nezirovic Habeas Br. at 26; *see also id.* at 32, 38; (Case No.

5:12-mc-00039, Dkt. # 37, at 24), is also unpersuasive.  Nezirovic acknowledges that "torture,"

persecution, and "other inhumane actions" all fall within the definition of crimes against

humanity, Nezirovic Habeas Br. at 26, and that is the precise type of conduct alleged here.  (*See*

Case No. 7:12-mc-00039, Dkt. # 18, at 33-37; *id.*, Dkt. # 23, at 7-10.)  Indeed, Nezirovic

challenges only a fraction of his chosen treatise's definition of "torture," namely a requirement

that conduct be a knowing part of a widespread or systematic attack on a population.  Nezirovic

Habeas Br. at 36; (*see also* Case No. 5:12-mc-00039, Dkt. # 37, at 27).  He disregards the

definition in the CAT and elsewhere.  Even the testimony of Nezirovic's geography expert belies

his claim.  Dr. Dahlman detailed war crimes committed during the war, (Transcript at 56-57),

including torture, indiscriminate targeting of civilians, and "clear violations of the Geneva

Conventions and the articles about crimes against humanity that came out in Nuremburg," (*id.* at

57).  Dr. Dahlman further acknowledged that the Geneva Conventions criminalizing torture had

been in effect since 1949, (*id.* at 74), and that torture had been criminal under international law

since that time, (*id.*), including specifically *both* torture in time of war and of those not involved

in the war, (*id.* at 74-75).  These provisions apply to Nezirovic's conduct.

In sum, there is simply no basis in law for Nezirovic's proportionality test of measuring

crimes against humanity against the conduct that provoked them, *see* Nezirovic Habeas Br. at 32-

38; (Case No. 5:12-mc-00039, Dkt. # 37, at 25).  Crimes against humanity, and specifically

45

torture, are forbidden under all circumstances.  The prohibition against torture is "a right

deserving of the highest status under international law," *Siderman*, 965 F.2d at 717, and "[n]o

exceptional circumstances whatsoever, whether a state of war or a threat of war, internal political

instability or any other public emergency, may be invoked as a justification of torture," CAT,

Art. 2, § 2.

Nezirovic's systematic beatings, threats, and humiliation during detention of his alleged

victims, for no stated purpose, constituted torture with no recognized justification or excuse

under any law.  His offense does not constitute a political one as a matter of law.  "Crimes

against humanity . . . are beyond the scope of the exception."  *Quinn*, 783 F.2d at 817.  *See also*

*Eain*, 641 F.2d at 520 (noting that the political offense exception "should be applied with great

care lest our country become a social jungle and an encouragement to terrorists everywhere");

*Ahmad*, 726 F. Supp. at 403 (emphasizing the need "to insure that the exception does not afford

immunity to those who commit atrocities for political ends").[19]

---

[19]     Any contention that Bosnia could be attempting to prosecute Nezirovic for political purposes—on which point there is no supporting evidence whatsoever—must be raised only with the Secretary of State.  *See, e.g.*, *Sacirbey*, 589 F.3d at 58, 69-70 (recounting such arguments and noting that such a "determination rests, of course, with the Executive Branch of Government, not the Judiciary"); *see also Ordinola*, 478 F.3d at 604-05 ("Any question into the [requesting] government's motivations is . . . well beyond this Court's legitimate realm of authority under the Treaty and must be addressed solely to the Secretary of State."); *Eain*, 641 F.2d at 516 ("[E]valuations of the motivation behind a request for extradition so clearly implicate the conduct of this country's foreign relations as to be a matter better left to the Executive's discretion."); *Barapind*, 360 F.3d at 1077 ("India's motivations for requesting the extradition are properly left to the Executive Branch."); *Koskotas*, 931 F.2d at 173 ("United States courts, including our own, generally have held that the motives of the requesting government, and the procedures and treatment awaiting the relator upon extradition, are matters for the Executive Branch rather than the Judicial Branch."); (Certification at 34).

## V.    CONCLUSION

For all the reasons described herein, we respectfully request that the Court deny

Nezirovic's habeas petition.  The submissions on behalf of the Bosnian government are sufficient

to sustain the charge under the provisions of the Treaty, and the Certification should be allowed

to proceed to the Secretary of State for his decision on extradition and surrender.

Respectfully submitted,

TIMOTHY J. HEAPHY
United States Attorney

 s/ Elizabeth G. Wright
Elizabeth G. Wright
Assistant U.S. Attorney
United States Attorney's Office for the
Western District of Virginia
P.O. Box 1709
Roanoke, VA 24008
Tel.: (540) 857-2250
Fax: (540) 857-2179
*timothy.heaphy@usdoj.gov*
*elizabeth.wright2@usdoj.gov*

CERTIFICATE OF SERVICE

I hereby certify that on January 3, 2014, I caused the foregoing RESPONSE IN

OPPOSITION TO ALMAZ NEZIROVIC'S PETITION FOR WRIT OF HABEAS CORPUS to

be electronically filed through this Court's CM/ECF system, which will send notification of such

filing to Fay Spence, counsel for Almaz Nezirovic.

 s/ Elizabeth G. Wright
Elizabeth G. Wright
Assistant U.S. Attorney
