IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| ALMAZ NEZIROVIC, | ) |
| | ) |
| Petitioner, | ) |
| | ) Civil Action No. 7:13cv428 |
| v. | ) |
| | ) |
| GERALD S. HOLT, | ) By:  Michael F. Urbanski |
| *United States Marshall, Western District of* | )        **United States District Judge** |
| *Virginia* | ) |
| | ) |
| and | ) |
| | ) |
| BOBBY D. RUSSELL, | ) |
| *Superintendent, Western Virginia Regional Jail* | ) |
| | ) |
| Respondents. | ) |

## MEMORANDUM OPINION

Petitioner, Almaz Nezirovic, is currently in the custody of the United States Marshal

pursuant to a Certification of Extraditability entered by Magistrate Judge Robert S. Ballou on

September 16, 2013 (the "Extradition Order").  The Extradition Order authorizes Nezirovic's

extradition to Bosnia and Herzegovina ("Bosnia") for alleged war crimes against civilians,

occurring from April through June 1992 during the Bosnian War.  After entry of the Extradition

Order, Nezirovic, by counsel, filed a petition for habeas corpus pursuant to 28 U.S.C. § 2241

challenging the Extradition Order.[1]  For the reasons set forth below, the petition is **DENIED**.

I.

Nezirovic is a citizen of Bosnia, who entered the United States in 1997 as a refugee.  In

April 1992, after Serbian troops attacked Nezirovic's hometown of Derventa, Nezirovic joined a

---

[1] Nezirovic's application for bail pending habeas review was denied by the court on November 27, 2013.

paramilitary group, the Croatian Defense Council ("the HVO") and became a prison guard at the Rabic prison camp in Derventa.

On January 12, 1993, the Doboj Police Department of Bosnia issued a Criminal Report against Nezirovic ("1993 Criminal Report"), charging him with committing war crimes against civilians, in violation of Article 142, paragraph 1 of the Criminal Code of the Socialist Federal Republic of Yugoslavia ("SFRY").[2]  The 1993 Criminal Report alleged that, during his time as a prison guard, Nezirovic physically abused, humiliated, and traumatized unarmed civilian prisoners, causing severe personal injury.[3]  On May 28, 2003, the Investigative Judge of the District Court of Doboj issued a warrant for Nezirovic's arrest.

On July 9, 2012, Bosnia submitted a formal request to the United States Department of State for the arrest, extradition and surrender of Nezirovic.  In response, on July 16, 2012, the United States filed an Extradition Complaint, seeking an order to extradite Nezirovic to Bosnia, pursuant to the treaty between the United States and the Kingdom of Servia[4] for the Mutual Extradition of Fugitives from Justice ("the Extradition Treaty")[5] and the United Nations

---

[2] Article 142, paragraph 1 of the SFRY states  in relevant part:
> [w]hoever in violation of the rules of international law effective at the time of war, armed conflict or occupation, orders….that the civilian population be subject to…torture…[or] immense suffering or violation of bodily integrity or health, [or] who commits some of the foregoing acts, shall be punished….

[3] The 1993 Criminal Report specifically alleged the following against Nezirovic:
> The reported Almaz Nezirović, in the period from 4 to 6 months of 1992 in Derventa, as a member of the HVO or the BiH TO took part in mass unlawful arrests and detention of persons of Serb ethnicity. He especially stood out in physical abuse and in May 1992 in the Rabic camp on several occasions he forced detainees to place three fingers on the table and then with other reported persons he would beat them with a baton on their fingers and on other parts of their bodies, and on that occasion he inflicted serious bodily injuries on Boro Marković, son of Nedo, Milorad Gunjević, Milo Kuzmanović, Luka Patković, Dr. Željko Stajčić, Zdravko Vidović, Milovan Adžić and Ilija Čuk.
> On 30 May 1992, together with Angijad Jusanović the reported person took part in beating Dr. Željko Stajčić with a baton all over his body, on which occasion he sustained a serious bodily injury consisting of a left arm calvicular fracture.

[4] As Serbia was then translated.

[5] The Extradition Treaty was signed at Belgrade on October 25, 1901 and entered into force on June 12, 1902.

Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment

("the CAT").[6]  The Extradition Complaint alleged that Nezirovic committed war crimes against

civilians, including torture and inhuman treatment, in violation of Article 142, paragraph 1 of the

Criminal Code of the SFRY, which was in effect at the time of the charged crimes  and remains

in effect in Bosnia today.  Then, on July 30, 2012, Bosnia provided supplemental documentation

in support of its application for extradition, including statements of twenty-one witnesses

alleging that Nezirovic committed acts of torture.[7]

After reviewing the Extradition Complaint and conducting a hearing, the magistrate judge

issued the Extradition Order on September 16, 2013, certifying Nezirovic as subject to

extradition under 18 U.S.C. § 3184.  Nezirovic filed a petition for a writ of habeas corpus on

September 18, 2013.  Nezirovic challenges the Extradition Order on two grounds:  (1) the

applicable statute of limitations has expired, and (2) his alleged offenses are political.  The

United States responds that the extradition is not barred by any statute of limitations and

Nezirovic's alleged conduct does not fall within the political offense exception.  For the

following reasons, the court finds that extradition is not barred by the statute of limitations, the

political offense exception does not apply to the alleged offenses, and Nezirovic's petition must

be denied.

## II.

There is no direct appeal for an individual found to be extraditable by a magistrate judge.

See 18 U.S.C. § 3184 (A magistrate judge has jurisdiction to review the evidence to determine

---

[6] The United States entered into the CAT on November 20, 1994, and Bosnia became a signatory to it on September 1, 1993.  See In re Extradition of Mujagic, No. 5:12-MJ-0529 (DEP), 2013 WL 6912667, 2013 U.S. Dist. LEXIS 182801 (N.D.N.Y. April 2, 2013).

[7] These witness statements alleged that Nezirovic had beaten detained civilians using his arms and legs, his rifle, batons or sticks; threatened prisoners with death; and humiliated the prisoners by forcing them to remove their clothing and crawl on the ground, to put their noses in others' anuses, and to eat grass on which others had urinated.

whether an extradition request can be sustained.); see also Collins v. Miller, 252 U.S. 364, 369 (1920).  Rather, a petition for a writ of habeas corpus is the only available means to challenge the magistrate judge's finding.  Further, a limited scope of review applies to extradition rulings and the court is not free "to rehear what the magistrate has already decided."  Fernandez v. Phillips, 268 U.S. 311, 312 (1925); see Ordinola v. Hackman, 478 F.3d 588, 598-99 (4th Cir. 2007) (noting that, "although the district court was free to make its own legal conclusions so long as they were supported by the magistrate judge's factual findings, it was not free to ignore or misinterpret those findings in an effort to reach a desired legal conclusion").

"[H]abeas corpus is available only to inquire whether the magistrate judge had jurisdiction, whether the offense charged is within the treaty and, by a somewhat liberal extension, whether there was any evidence warranting the finding that there was reasonable ground to believe the accused guilty of the asserted crimes."  Ordinola, 478 F.3d at 598-599 (quoting Fernandez, 268 U.S. at 312); see also Sacirbey v. Guccione, 589 F.3d 52, 63 (2d Cir. 2009).  "[T]he political offense question is reviewable [in habeas review]…as part of the question of whether the offense charged is within the treaty."  Quinn v. Robinson, 783 F.2d 776, 791 (9th Cir. 1986).

In the context of this habeas petition, the magistrate judge's factual findings must be reviewed under a clearly erroneous standard.  See Ordinola, 478 F.3d at 598 (citing Ornelas v. Ruiz, 161 U.S. 502, 509, 511 (1896)).  However, his legal determinations and mixed determinations of law and fact must be reviewed *de novo*.  See Quinn, 783 F.2d at 791.  Treaty interpretation presents a question of law, subject to *de novo* review.  Yapp v. Reno, 26 F.3d 1562, 1565 (11th Cir. 1994).   Likewise, the determination of foreign law is a question of law.  See United States v. Mitchell, 985 F.2d 1275, 1280 (4th Cir. 1993) ("The determination of

4

foreign law is a question of law to be established by any relevant source, whether or not submitted by a party or admissible under the Federal Rules of Evidence.").

In the Extradition Order, the magistrate judge found:  (1) that there is an extradition treaty in force between the United States and Bosnia and that the court had jurisdiction in the matter; (2) that Nezirovic is the person whose extradition Bosnia requested; (3) that Nezirovic has been charged with war crimes against civilians; (4) that the charged crimes are extraditable under the Extradition Treaty; and (5) that the evidence establishes probable cause to believe Nezirovic committed the charged offense.  In accordance with <u>Ordinola</u>, the court finds that the magistrate judge had jurisdiction,[8] the crimes fall within the Extradition Treaty,[9] and sufficient grounds

---

[8] Nezirovic does not contend that the magistrate judge lacked authority to conduct an extradition hearing, nor that the court lacked jurisdiction over his person.  Indeed, 18 U.S.C. § 3184 granted the court jurisdiction over petitioner because he was found within the Western District of Virginia and is currently in federal custody here.

[9] The magistrate judge determined that the Extradition Treaty encompasses the charges against Nezirovic, regardless of whether the Treaty is a "list" or "dual criminality" treaty.  Article I of the Extradition Treaty provides for the extradition of persons "charged with or convicted of any of the crimes and offenses" specified in Article II, provided that:
> This shall only be done upon such evidence of criminality as, according to the laws of the place where the fugitive or person so charged shall be found, would justify his apprehension and commitment for trial if the crime or offense had been committed there.

Article II further provides:
> Extradition is also to take place for participation in any of the crimes and offenses mentioned in this Treaty, provided such participation may be punished in the United States as a felony and in Servia as a crime or offense as before specified.

As the magistrate judge noted, Article II of the Extradition Treaty does not list "war crimes" or "torture" as extraditable offenses.  However, the CAT, which supplements the Extradition Treaty, includes torture and inhuman treatment as listed offenses.  When the United States and Bosnia entered into the CAT, torture became an extraditable offense under the Extradition Treaty.  The magistrate judge found the CAT definition of torture "captures the specific conduct that underlies the charge against Nezirovic – that he intentionally inflicted serious pain upon persons under his control while a guard at the Rabic prison camp."  Extradition Order, at 10.  The court finds that Nezirovic is being charged with conduct that satisfies the requirements if the treaty is analyzed as a list treaty.

Under a dual criminality analysis, the charged conduct must be considered a crime under the laws of both the United States and Bosnia.  <u>In re Extradition of Cervantes Valles</u>, 268 F. Supp. 2d 758, 770 (S.D. Tex. 2003).  Nezirovic is being charged with alleged conduct in violation of Article 142, paragraph 1 of the Criminal Code of the SFRY, thus the charged acts are criminal under Bosnian law.  Nezirovic's alleged actions are likewise considered criminal under 18 U.S.C. § 2340A (the "Torture Act").  18 U.S.C. § 2340A states in relevant part, "[w]hoever outside the United States commits or attempts to commit torture shall be fined under this title or imprisoned."  The Torture Act defines torture as "an act committed by a person acting under the color of laws specifically intended to inflict severe physical pain or suffering…upon another person within his custody or physical control."  18 U.S.C. § 2340.

existed to support the magistrate judge's finding that the evidence established probable cause that Nezirovic committed the charged offenses. [10]  See Ordinola, 478 F.3d at 598.

The magistrate judge also found that the statute of limitations and political offense exception defenses raised by Nezirovic did not preclude certification to the Secretary of State for extradition to Bosnia.

**III.**

As stated previously, Nezirovic raises two principal arguments in support of his petition: (1) extradition is barred because the statute of limitations has expired; and (2) his alleged war crimes were political offenses exempt from extradition.  These questions are either purely legal, or mixed questions of law and fact, and, therefore, the court reviews the magistrate judge's findings *de novo*.

---

Although the United States did not enact the Torture Act until 1994, after Nezirovic allegedly committed the charged acts, in determining dual criminality, the court looks to the law in effect at the time the extradition demand is made.  "The law pertinent to the question of extradition is the law in force *at the time of the demand*." Extradition of Murphy, No. 98-M-168, 1998 WL 1179109, at *5 n.3 (N.D.N.Y. June 30, 1998) (emphasis original) (citing United States ex rel Oppenheim v. Hecht, 16 F.2d 955 (2d Cir. 1927); Hilario v. United States, 854 F. Supp. 165, 176 (E.D.N.Y. 1994)).  But see United States v. Wathne, No. CR 05-0594 VRW, 2008 WL 4344112, 2008 U.S. Dist. LEXIS 79348 (N.D. Cal. Sept. 22, 2008) ("[T]his court concludes that the dual criminality requirement of the extradition treaty under Indian law requires that the offense charged be punishable in both countries at the time of the conduct that constitutes the offense.")  Even if the holding in Wathne is applied, however, the dual criminality requirement is met.  That is because, even excluding consideration of the 1994 Torture Act, the conduct alleged against Nezirovic was illegal under other criminal statutes when it was allegedly committed in 1992.  See, e.g., 18 U.S.C. § 113(a)(6) (assault resulting in serious bodily injury); Va. Code §§ 18.2-51 (malicious wounding) & 57 (assault and battery).  Thus, the dual criminality test is met whether the court applies the law in effect at the time of the request or the law in effect at the time of the offense.  As such, the court finds that Nezirovic is being charged with conduct that satisfies the requirement of either a "list" or "dual criminality" treaty.

[10] The court has reviewed the evidence that the United States submitted to the magistrate judge.  There was ample evidence to support the magistrate judge's finding "that the complaint states sufficient probable cause to believe that Nezirovic committed war crimes against civilians in violation of Article 142, paragraph 1 of the Criminal Code of the SFRY."  Extradition Order, at 13.  The district court need only determine whether the magistrate judge considered "any evidence" to support the magistrate judge's finding of probable cause.  Ordinola, 478 F.3d at 598; see Collins v. Loisel, 259 U.S. 309, 316 (1922) ("The function of the committing magistrate is to determine whether there is competent evidence to justify holding the accused to await trial, and not to determine whether the evidence is sufficient to justify a conviction.").

### A. Statute of Limitations

Nezirovic makes two arguments in support of his claim that extradition is barred because the statute of limitations has expired. Nezirovic first argues that the Torture Act cannot provide the applicable limitation period because it did not exist in 1992 and applying the Torture Act's limitation period would violate constitutional prohibitions against *ex post facto* laws. Second, Nezirovic argues that the 1993 Criminal Report filed in Bosnia did not toll the running of any applicable limitation period.[11]

The United States argues that the statute of limitations set forth in the Torture Act applies and does not violate *ex post facto* laws. It further argues that there is no limitation period under the Torture Act because the charged crimes involved torture with a serious risk of physical injury. See 18 U.S.C. §§ 3286(b) & 2332b(g)(5)(B)(i) (The Torture Act, 18 U.S.C. § 2340A, has an eight year limitation period for the prosecution of torture, but no limitation where the offense charged "resulted in or created a foreseeable risk of death or serious bodily injury to another."). The United States also argues that the 1993 Criminal Report tolled any applicable statute of limitations.

### 1.     The Torture Act's Statute of Limitations

Article VII of the Extradition Treaty bars extradition if the applicable statute of limitations in the United States has expired.[12] Nezirovic asserts that, in determining what statute

---

[11] In the underlying extradition proceeding, the government bore the burden of providing by a preponderance of the evidence that the statute of limitations had not expired or was tolled. Jhirad v. Fernandina, 536 F.2d 478, 485 (2d Cir. 1976); Skaftouros v. United States, 667 F.3d 144, 158 (2d Cir. 2011). In contrast, at the habeas stage, "the petitioner must prove by a preponderance of the evidence that he is in custody in violation of the Constitution or laws or treaties of the United States," 28 U.S.C. § 2241(c)(3), which, in this context, will typically mean in violation of the federal extradition statute, 18 U.S.C. § 3184, or the applicable extradition treaty." Skaftouros, 667 F.3d at 163.

[12] The Extradition Treaty provides as follows:
> Extradition shall not be granted, in pursuance of the provisions of this Treaty, if legal proceedings or the enforcement of the penalty for the act committed by the person claimed has become barred by limitation, according to the laws of the country to which the requisition is addressed.

of limitations is applicable under United States law, "the court must look to the substantive offense under United States law – at the time the offense occurred – which is most closely analogous to the charged offense, and apply the statute of limitations applicable to that offense." Br. in Supp. of Petition, Dkt. No. 20, at 8. Because the 1994 Torture Act, 18 U.S.C. 2340, et seq., post-dated Nezirovic's alleged 1992 war crimes, Nezirovic argues it cannot provide the applicable limitation period. While Nezirovic concedes that the *ex post facto* clause does not apply to new or amended treaty provisions, such as the CAT, he asserts it does apply "when the Treaty requires consideration of the applicable statute of limitations in [the United States of America]." Id. at14. Nezirovic posits that the most analogous federal crime in 1992 was simple assault, 18 U.S.C. § 113, for which a five year limitation period applies to non-capital offenses. See 18 U.S.C. § 3282. Thus, Nezirovic argues that he cannot be extradited because the charges against him were not filed within the five year limitation period provided for in § 3282, specifically by July 1997.

The court agrees with the conclusion of the magistrate judge in the Extradition Order that the applicable limitation period must be determined based on the laws in effect at the time of the extradition request and not at the time the alleged acts occurred. The Second Circuit's decision in United States ex rel. Oppenheim v. Hecht, 16 F.2d 955, 956 (2d Cir. 1927), stands in square opposition to Nezirovic's argument that applying the limitation period for the Torture Act would violate the *ex post facto* clause. In Oppenheim, the petitioner was indicted in Scotland for bankruptcy fraud which, at the time he committed the offense, was not a crime in the United States. However, Congress subsequently amended the United States bankruptcy laws to make the alleged fraud illegal, satisfying the dual criminality requirement of the extradition treaty. The Second Circuit rejected the argument that petitioner was immune from extradition because at the

8

time he committed his offense there was no United States law criminalizing his conduct.  The

court rejected a defense to extradition related to *ex post facto,* stating:

> Extradition proceedings are not in their nature criminal, even if the relator is a criminal; extradition is not punishment for crime, though such punishment may follow extradition; therefore all talk of *ex post facto* legislation, or of the niceties of common law on the criminal side, is quite beside the mark.

Id. (citing Glucksman v. Henkel, 221 U.S. 508 (1911); Grin v. Shine, 187 U.S. 181 (1902)).

The Oppenheim court considered the issue "completely covered" by the 1874 decision in In re

De Giacomo, 12 Blatchf. 391, 7 F. Cas. 366 (C.C. N.Y. 1874), where the court reasoned as

follows:

> By an *ex post facto* law is meant one which imposes a punishment for an act which was not punishable at the time it was committed, or imposes additional punishment to that then prescribed, or changes the rules of evidence, by which less or different testimony is sufficient to convict than was then required.  Cummings v. Missouri, 4 Wall [71 U.S.] 326.
>
> It is contended, in the present case, that the effect of extradition for a crime committed before the making of the treaty is to punish the party, by depriving him of his liberty, and sending him out of the United States, and delivering him up to a foreign authority, and to punish him for remaining and being found in the United States, when he could not have been thus punished at the time the treaty was made.  But, the fact of extradition cannot properly be regarded as 'punishment,' within the sense of that word, as used when considering the subject of *ex post facto* laws.  There is no offence against the United States, and no trial for any such offence, and no punishment for any such offence.  It is true, that extradition relates only to criminal offences, but it relates only to criminal offences committed abroad; and no treaty for extradition, nor any statute passed in relation to extradition, purports to punish the fugitive for the offence.  Both treaties and statutes assumed that he is to be tried upon the charge, if not already convicted.  With the question of punishment, or its kind or degree, they have no concern.  They merely declare that the protection of this government shall not be interposed between the fugitive and the laws which he has violated, and that, if he flees higher for such protection, the injured government may take him hence, and shall be aided therein.  This government neither assumes nor exercises any power to punish for

> the crime. The fact that the fugitive is deprived of his liberty does not make such deprivation a punishment.

Id. at 370.

The Oppenheim court's refusal to apply *ex post facto* considerations to extradition proceedings was consistent with Justice Harlan's earlier decision in Neely v. Henkel, 180 U.S. 109 (1901). In that case, Neely was wanted in Cuba for postal fraud occurring between July 1, 1899 and May 1, 1900. On June 6, 1900, Congress amended the existing extradition statute to authorize the return of alleged criminals to foreign countries or territories occupied or controlled by the United States.[13] The Court rejected Neely's argument that the June 6, 1900 amendment was unconstitutional, concluding as follows:

> Allusion is here made to the provisions of the Federal Constitution relating to the writ of habeas corpus, bills of attainder, *ex post facto* laws, trial by jury for crimes, and generally to the fundamental guaranties of life, liberty, and property embodied in that instrument. The answer to this suggestion is that those provisions have no relation to crimes committed without the jurisdiction of the United States against the law of a foreign country.

Id. at 122.

Following Oppenheim, other courts have rejected extradition challenges based on the *ex post facto* clause of the United States Constitution. The issue was addressed at length in In re Extradition of McMullen, 769 F.Supp. 1278, 1290-93 (S.D.N.Y. 1991) (rejecting *ex post facto* challenge to extradition but granting writ of habeas corpus on bill of attainder grounds), aff'd McMullen v. United States, 953 F.2d 761 (2d Cir. 1992), and aff'd in part, rev'd in part, In re Extradition of McMullen, 989 F.2d 603 (2d Cir.) (en banc) (reversal pertains to bill of attainder ruling), and cert. denied, 510 U.S. 913 (1993). The United Kingdom sought extradition of

---

[13] The Court took judicial notice of the fact that Cuba was occupied by and under the control of the United States on June 6, 1900 (as a result of the Spanish-American War) and remained so occupied when the court rendered its decision in 1901.

McMullen for acts of violence related to his involvement in the Provisional Irish Republican

Army.  A magistrate judge denied the extradition request under the political offense exception.

Subsequently, the United States and the United Kingdom entered into a new treaty limiting the

scope of the political offense exception, and the extradition request was reinstituted.  McMullen

challenged the extradition on bill of attainder and *ex post facto* grounds.  The district court

agreed with McMullen that his extradition was barred on bill of attainder grounds[14], but rejected

his argument regarding *ex post facto* laws.   The district court reasoned as follows:

> In the Court's view, the Supreme Court's narrow construction of
> punishment under the *ex post facto* clauses does not extend to the
> treatment McMullen has received, for the *ex post facto* prohibition
> is 'confined to laws respecting criminal punishments and has no
> relation to retrospective legislation of any other description.'  An
> extradition proceeding is not a criminal prosecution; accordingly,
> the deprivation of a successful defense to extradition is not
> criminal punishment.   Accordingly, the court finds that the
> application to McMullen of the Supplementary Treaty does not
> violate the constitutional ban against *ex post facto* laws.

Id. at 1293.  (internal citations omitted).

In Hilario v. United States, 854 F. Supp. 165, 176 (E.D. N.Y. 1994), the court rejected

the argument that Hilario, a United States citizen, could not be extradited to Portugal because his

criminal conduct predated the enactment of 18 U.S.C. § 3196, a statute authorizing extradition of

United States citizens.  Citing Oppenheim, McMullen, In re De Giacomo and other cases, the

court denied the habeas petition, noting that the purpose of extradition statutes and treaties is to

ensure "that a nation's territory is not 'made a place of refuge for criminals.'" Id.  (quoting In re

De Giacomo, 7 F. Cas. at 369).  The court stated:

---

[14] A panel of the Second Circuit Court of Appeals agreed that the extradition was barred, finding the new treaty to be a bill of attainder targeting McMullen and two others.  McMullen, 953 F.2d 761.  However, the Second Circuit, sitting *en banc*, reversed, concluding that the supplementary extradition treaty was not a bill of attainder as applied to McMullen.  McMullen, 989 F.2d 603.

> The asylum country['s] (…) sole focus is on the propriety of his
> surrender.   Thus, the law pertinent to this inquiry, whether
> reflected in treaty or statute, is determined solely with reference to
> the time surrender is demanded.

Id.  at 176.  See also Extradition of Murphy, 1998 WL 1179109, at *5, n.3; United States v.

Ramnath, 533 F. Supp. 2d 662, 672-73 (E.D. Tex. 2008).

Nezirovic argues that Oppenheim was wrongly decided by the Second Circuit, relying

instead on In re Extradition of Azra Basic, No. 5:11-MJ-5002-REW, 2012 WL 3067466, 2012

U.S. Dist. LEXIS 104945 (E.D. Ky. July 27, 2012), which involves the same treaty as the instant

case.  Basic was also accused of committing war crimes in Derventa in 1992 and, like Nezirovic,

she argued that the statute of limitations barred her extradition for alleged torture.  The

magistrate judge accepted her argument, concluding as follows:

> The specific torture statute did not become effective until April
> 1994, two years after the Derventa events.  In the United States,
> there could be no valid legal proceedings against Basic under a
> substantive statute that post-dates the alleged torture. . . .  If there
> could be no legitimate prosecution under § 2340A, under *ex post
> facto* principles, it would make no sense to analyze timeliness
> premised on that (inapplicable) statute.

2012 WL 3067466, at *14, 2012 U.S. Dist. LEXIS 104945, at * 49.

In reaching this conclusion, the magistrate judge in Basic conflates consideration of the

United States' statute of limitations with the wholly separate constitutional prohibition against *ex

post facto* prosecution.  The Extradition Treaty references the former, but it makes no mention of

the latter.  Following the Basic decision would require the court to apply American constitutional

protection against *ex post facto* prosecutions to Nezirovic in considering whether he is

extraditable under the Extradition Treaty.  The plain language of the Extradition Treaty does not

require this, and the court cannot add it.  "[T]o alter, amend, or add to any treaty, by inserting

any clause, whether small or great, important or trivial, would be on our part an usurpation of

power, and not an exercise of judicial functions.  It would be to make, and not to construe a

treaty." Chan v. Korean Air Lines, Ltd., 490 U.S. 122, 135 (1989) quoting The Amiable

Isabella, 6 Wheat. 1, 71, 5 L.Ed. 191 (1821).

Nezirovic attempts to distinguish the cases relied on by the magistrate judge regarding *ex*

*post facto* concerns as dealing with determining whether dual criminality exists under a treaty,

and argues the cases do not apply to the instant statute of limitations issue.  Nezirovic asserts

"which statute of limitations applies is separate from the issue of whether the offense conduct

constitutes an extraditable crime under the Treaty."  Br. in Supp. of Petition, Dkt. No. 20, p. 8.

Nezirovic contends that the language in Article VII of the Extradition Treaty means that

application of the United States' statute of limitations "must comply with United States law,

especially the Constitution."  Id., at 10.

The Ninth Circuit addressed an argument somewhat analogous to Nezirovic's in Kamrin

v. United States, 725 F.2d 1225 (9th Cir.), cert. denied, 469 U.S. 817 (1984).  In Kamrin, a

provision in the applicable Treaty provided that "the person whose extradition is sought shall

have the right to use such remedies and recourses as are provided by [the law of the requested

state]."  Kamrin claimed that this language entitled him to the due process right that underlies

United States statutes of limitations: the right to a trial in which his defense is unimpaired by the

passage of time.  The court rejected the defendant's claim and, citing Neely, 180 U.S. 109, held

that due process rights could not be extended extraterritorially.  Id. at 1228. ("Time may have

eroded [defendant's] ability to present a defense in Australia, but time has not eroded the holding

of Neely.")  In similar vein, the Ninth Circuit later rejected an argument under the "remedies and

recourses" provision of the United States extradition treaty with Argentina, holding that where

extradition was not barred by the statute of limitations, the "remedies and recourses" provision

did not entitle a defendant to additional constitutional protections.  In re Extradition of

Kraiselburd, 786 F.2d 1395, 1398 (9th Cir.), cert. denied, 479 U.S. 990 (1986).

Admittedly, Nezirovic's argument is better than those presented in Kamrin and

Kraiselburd because it relies on Article VII in the Extradition Treaty, providing that extradition

shall not be granted "if legal proceedings or the enforcement of the penalty for the act committed

by the person claimed has become barred by limitation, according to the laws of the country to

which the requisition is addressed."  However, the United States' has no statute of limitations for

torture resulting in serious bodily injury.  Further, the language in Article VII of the Extradition

Treaty does not entitle Nezirovic to *additional* United States constitutional protections against *ex

post facto* laws. [15]

As the court noted in the extradition case of Gallina v. Fraser, 177 F. Supp. 856, 866 (D.

Conn. 1959), albeit in a different context:

> Regardless of what constitutional protections are given to persons held for trial in the
> courts of the United States or of the constituent states thereof, those protections cannot be
> claimed by an accused whose trial and conviction have been held or are to be held under
> the laws of another nation, acting according to its traditional processes and within the
> scope of its authority and jurisdiction.

---

[15]  Moreover, even were the court to read into the Extradition Treaty protections found in our Constitution as
Nezirovic argues, his extradition does not run afoul of the *Ex post facto* Clause.  The *Ex post facto* Clause of the
Constitution prohibits retroactive application of laws that impose new or more serious penalties than existed at the
time of the offense.  Collins v. Youngblood, 497 U.S. 37, 42 (1990).  For Nezirovic, applying the statute of
limitations from the Torture Act results in extradition, whereby, applying the five year statute of limitations in 18
U.S.C. § 113 does not (assuming no tolling).  Nezirovic argues that application of the Torture Act statute of
limitations is an impermissible *ex post facto* law.  However, the problem with his argument is that extradition is not
punishment.  Oppenheim, 16 F.2d at 956 ("[E]xtradition is not punishment for crime, though such punishment may
follow extradition…."); In re De Giacomo, 7 F. Cas. at 370 ("Extradition cannot properly be regarded as
'punishment,' within the sense of that word, as used when considering the subject of *ex post facto* laws (…) The fact
that the fugitive is deprived of his liberty does not make such deprivation a punishment.").  In the extradition
context, retrospective application of the Torture Act statute of limitations is not an *ex post facto* law.  See In re De
Giacomo, 7 F. Cas. at 370.("Every *ex post facto* law must necessarily be retrospective, but every retrospective law is
not an *ex post facto* law.")  Thus, retroactive application of the Torture Act, and the resulting extradition of
Nezirovic, does not violate the *Ex post facto C*lause simply because extradition is not punishment.

Id.; see, e.g., Martin v. Warden, 993 F.2d 824, 829 (11th Cir. 1993) (No Sixth Amendment right to a speedy trial or Fifth Amendment right against undue delay in extradition cases); DeSilva v. DiLeonardi, 181 F.3d 865, 868-69 (7th Cir. 1999) (No Sixth Amendment right to effective counsel in extradition proceedings).

In sum, the court believes that the magistrate judge in this case got it right when he concluded that "[t]he conclusion reached by the Basic court is contrary to the express language of the Extradition Treaty and the overwhelming authority holding that the law in force at the time of demand controls the extradition analysis." Extradition Order at 21. While it is true that the cases discussing *ex post facto* deal primarily with determining dual criminality, the court finds that the reasoning therein applies equally to determining which United States' statute of limitations governs.

Accordingly, the court concludes that the Torture Act is the most analogous United States statute applicable to the Extradition Treaty. Because the allegations in this case concern a forseeable risk of death or serious bodily injury to another person, 18 U.S.C. § 3286(b), no limitation applies.[16] The Extradition Order in this case exhaustively considered Nezirovic's statute of limitations argument, and the court concludes that it is correctly decided.[17] In sum, the

---

[16] The term "serious bodily injury" is defined in 18 U.S.C. §2332b(g)(3) and 18 U.S.C. §13655(h)(3) as meaning "bodily injury which involves (A) a substantial risk of death; (B) extreme physical pain; (C) protracted and obvious disfigurement; or (D) protracted loss or impairment of the function of a bodily member, organ, or mental faculty." Plainly, the allegations of this case directed at Nezirovic concerning beatings with batons meet this definition.

[17] Scant case law exists on the precise issue of retrospective application of statutes of limitation in extradition proceedings. However, in United States. v. Bogue, No. 98-572-M, 1998 U.S. Dist. LEXIS 20133, 1998 WL 961369 (E.D. Pa. 1998), the court refused to apply constitutional safeguards to prevent the retrospective application of a longer statute of limitations in an extradition context. The applicable treaty between the United States and France provided that "[e]xtradition shall not be granted when the person claimed has, according to the law of either the requesting or requested Party, become immune by the reason of lapse of time from prosecution or punishment." 1998 U.S. Dist. LEXIS 2013, at *6, 1998 WL, at *1. At the time of Bogue's alleged crime in 1986, the French Criminal Code required the government to extradite, prosecute, and convict him within a five year statutory period. The French government did not attempt to extradite Bogue until 1998. However, in 1987, France revised the Criminal Code to expand the period of limitations to twenty years. The court disagreed with Bogue's argument that the United States Constitution protects him from retrospective application of the twenty year statute of limitations in

15

court rejects Nezirovic's argument that the charges against him are time-barred, thereby

disqualifying him from extradition under the Extradition Treaty.[18]

### B.     Political Offense Exception

The political offense exception to extradition forbids countries from extraditing people

accused of offenses that are political in nature.  The Extradition Treaty provides the following

political offense exception in Article VI:

> A fugitive criminal shall not be surrendered if the offense in
> respect of which his surrender is demanded be of a political
> character, or if he proves that the requisition for his surrender has,
> in fact, been made with a view to try to punish him for an offense
> of political character.

In Ordinola, the Fourth Circuit identified two categories of political offenses.  "Pure"

political offenses are "perpetrated directly against the state and do not intend to cause private

injury," such as treason, sedition and espionage.[19]  Id. at 596.  "Relative" political offenses are

common crimes that are "so intertwined with a political act that the offense itself becomes a

political one."  Id.  The Fourth Circuit further adopted the "incidence test" to determine whether

a "relative" political offense is sufficiently political to fall within the exception.  The incidence

test asks:  (1) whether there was a violent political disturbance or uprising in the requesting

---

France.  Noting that "[s]afeguards equivalent to those constitutionally required by American law are not
automatically applicable to foreign governments seeking the extradition of an American citizen pursuant to an
extradition treaty," the court held that "whether the French government can apply the twenty year statute of
limitations period retrospectively is a matter for the French courts."  Id. at *6.

[18] In the alternative, the magistrate judge determined that the 1993 Criminal Report issued by the Doboj Police
Department of Bosnia tolled the statute of limitations under Bosnian law.  In so doing, the magistrate judge relied on
an unrebutted affidavit from District Prosecutor Izudin Berberovič to that effect.  Because the court concludes that
no statute of limitations applies under the laws of the United States to the alleged crime of torture that resulted in, or
created a foreseeable risk of, death or serious bodily injury to another person, the court need not reach the question
of whether the 1993 Criminal Report tolls the statute of limitations under Bosnian law.

[19] The charged offenses clearly do not constitute pure political offenses.

country at the time of the alleged offense; and if so, (2) whether the alleged offense was incidental to or in the furtherance of the uprising.  Id. at 597.

The magistrate judge's purely factual findings underlying the application of the political offense exception must be reviewed under the clearly erroneous standard.  Ordinola, 478 F.3d at 598.  The mixed question of fact and law, however, such as whether the alleged crime was incidental to a political uprising, and questions solely of law must be reviewed *de novo*.  Quinn, 783 F.2d at 791; Ahmad v. Wigen, 726 F.Supp. 389, 408 (E.D.N.Y. 1989); see also Ordinola, 478 F.3d at 597 (quoting Ornelas, 161 U.S. at 509) (The political offense extradition question standard of review is a "question of mixed law and fact, but chiefly of fact.").

Thus, to fall within the political offense exception, Nezirovic's alleged actions must have been incidental to or in furtherance of a violent political uprising in Bosnia.  There is no real doubt that the crimes Bosnia accuses Nezirovic of committing occurred during a time of violent political disturbance in that country.  The magistrate judge took judicial notice of the conflict in Bosnia between March of 1992 and December of 1995, noting there was "organized military action in Bosnia between the Bosnian Serbs, Croats, and Bosniaks, which involved mass killing, expulsion, deportation, rape, and torture."  Extradition Order, at 29.  However, although Nezirovic's actions occurred in the course of a violent political uprising, he cannot show that the magistrate judge erred in finding that those alleged actions were not incidental to or in furtherance of the political disturbance.

The relative political offense analysis is both objective and subjective, "although the objective must usually carry more weight."  Ordinola, 478 F.3d at 600.  Under the subjective prong, "for a claimant to come within the protections of the political offense exception, it is necessary but not sufficient, for the claimant that he was politically motivated."  Id.  Thus, "a

17

claimant whose common crime was not subjectively politically motivated cannot come within

the exception regardless of whether the offense itself could be described as an objectively

'political' one." Id. The objective prong requires that a claimant "also show that the offense was

objectively political" because the Extradition Treaty "exempts political *offenses*, and a political

motivation does not turn every illegal action into a political offense." Id. (emphasis original).

The court examines the totality of the circumstances surrounding Nezirovic's involvement in the

charged offenses to analyze the subjective and objective prongs, including the mode of the attack

and the identity of the victims. See Ordinola, 478 F.3d at 601.

Nezirovic states that, subjectively, he was politically motivated to join the HVO to

protect his home and family. He argues that the magistrate judge erred by concluding that "his

subjective desire to protect his homeland and family from the attacking soldiers was not a 'deep-

rooted political reason.'"[20] Br. in Supp. of Petition, Docket No. 20, at 28. Nezirovic also argues

that, objectively, he was politically motivated because he "would not have been a member of the

HVO or a guard at the Rabic Camp but for the war and the desire to protect his family." Id. at

29. He further argues his actions were not "disproportional" in light of the violence in the region

at the time because the prisoners were enemy combatants.[21] Nezirovic asserts that his alleged

crimes do not constitute "crimes against humanity" and fall within the political offense

---

[20] At the habeas hearing, Nedzad Mujkic testified that in 1992 he and several other Bosnians, including Nezirovic, ripped down posters placed around Derventa by Serbian nationalists. Mujkic stated this action was in support of an independent Bosnia because the posters purportedly encouraged Bosnia to become part of Serbia. Nezirovic argued that Mujkic's testimony supports his claim of a political motive regarding his alleged crimes against the civilian prisoners.

[21] In essence, Nezirovic argues that the court should weigh the relative inhumanity of the alleged war crimes perpetuated by Nezirovic with those committed by the forces allied with the Bosnian Serbs he was guarding, suggesting that Nezirovic's alleged conduct pales in comparison to the war crimes committed by the Bosnian Serbs. The court categorically rejects this argument. The issue is not whether Nezirovic's alleged conduct was less egregious than that of the Bosnian Serbs. Rather, the issue is whether Nezirovic's conduct falls within the political offense exception. Thus, properly framed, the court cannot agree with Nezirovic that the alleged torture of unarmed prisoners qualifies as a political offense.

18

exception.  The United States argues that that political offense exception does not apply because Nezirovic's alleged victims were civilians and the torture of unarmed civilian prisoners falls outside the political offense exception.

Nezirovic's alleged victims were unarmed prisoners at the Rabic camp and the court must afford deference to the magistrate judge's factual finding that these alleged victims were civilians.[22]  In Ordinola, the Fourth Circuit held that victims' status as civilians is relevant to the political exception analysis and noted that the United States Department of State considers the political offense exception inapplicable to violent attacks on civilians.  Id. at 603.  The magistrate judge also found no evidence that Nezirovic's alleged actions of beating, degrading and humiliating prisoners were in furtherance of his military duty as a prison guard.  The court finds that Nezirovic failed to meet his burden to prove that his actions were incidental to or in furtherance of the violent political uprising in Bosnia, and thus the political offense exception does not apply.

### IV.

For these reasons, the petition for a writ of habeas corpus is **DENIED**.

An appropriate Order will be entered.

Entered:  March 13, 2014

*/s/ Michael F. Urbanski*

Michael F. Urbanski
United States District Judge

---

[22] See Ordinola, 478 F.3d at 599 ("For one of many examples [of district court error], the district court's finding that 'Ordinola did not knowingly murder innocent civilians,' … is contradicted by the magistrate judge's opposite finding that Ordinola's victims 'were clearly civilians.'"); see also id. at 604 ("…the magistrate judge's reasonable finding that Ordinola's alleged offenses were carried out against innocent civilians largely dooms Ordinola's argument.  Because that finding was legitimately made, it simply cannot be said that the magistrate judge had no choice but to define Ordinola's alleged actions as political offenses.").